SALCINES, Judge.
Michael Rhoden entered a plea of nolo contendere to the charges of resisting law enforcement officers without violence, possession of cocaine with intent to sell, and possession of drug paraphernalia. He reserved the right to appeal the denial of his dispositive motion to suppress. In the motion, Rhoden argued that the law enforcement officers lacked reasonable suspicion to conduct a “Terry Stop”[1] and lacked probable cause to detain him. We reverse.
An evidentiary hearing on the motion to suppress was conducted. Testimony was presented that four “task force members” of the Highlands County Sheriffs Department in an unmarked Ford Explorer[2] approached the intersection of Highlands Avenue and Lemon Street in Sebring at approximately 1 p.m. on October 29, 2003. While there had been no reports of any specific criminal activity at that intersection, the testimony of the task force members revealed that the area was known for drug activity and was a high crime area.
The task force members were in regular street clothes with no insignia on their clothing to identify them as law enforcement officers. The task force members did have badges which hung from chains around their necks; however, one task force member testified that the badges were hidden while they were inside the vehicle.[3]
As the Ford Explorer approached the intersection, the task force members noticed a man, who was ultimately identified as Rhoden, walking “briskly” away from their direction while talking on a cellular telephone.[4] Rhoden looked back at the Ford Explorer repeatedly as it approached the intersection and when it stopped at a stop sign. The driver of the Ford Explorer pulled to the curb and parked the vehicle. As two task force members cracked *7 open their doors to exit the vehicle, Rho-den looked at the vehicle and began running.[5] The task force members chased Rhoden on foot, shouted for him to stop, and identified themselves as law enforcement officers. Thereafter, the lights and siren on the Ford Explorer were activated and a chase ensued. Rhoden was eventually apprehended, and he struggled vfith the officers as they attempted to place handcuffs on him. After he was subdued, the task force members removed a Tylenol pill bottle from Rhoden’s hand which contained crack cocaine.
An investigatory stop must be based on more than a mere hunch. See Slydell v. State, 792 So.2d 667 (Fla. 4th DCA 2001). The driver of the Ford Explorer, Investigator Jamie Davidson testified that Rhoden was walking across the intersection and talking on a cell phone when he first observed him. He stated that Rhoden “[h]ad a great interest in my vehicle approaching the intersection.” Inv. Davidson testified that the fact that Rhoden was talking on a cell phone and that he had something in his hand was not suspicious, but his brisk walk with his other actions were suspicious. When questioned about these other actions, Inv. Davidson testified:
While he was speaking on the telephone walking briskly away from us, he was very concerned about our presence. My vehicle was, obviously, known as an unmarked police vehicle associated with Special Operations Division. And he was very concerned with where we were and if we are going to get out of it. Because he was constantly looking back while he was on the phone.
Investigator Ryan Magnuson, who recognized Rhoden from an earlier citizen encounter, .admitted that while Rhoden was observing the vehicle as he was walking away, it was possible that he did not recognize him from the earlier two or three minute encounter. Inv. Magnuson admitted that speaking on a cell phone was not suspicious, but he noted that Rhoden “continued to look back at us, making eye contact with the vehicle which is known in that area.” Inv. Magnuson admitted that he did not know if Rhoden had knowledge that the Ford Explorer was a law enforcement vehicle.
Deputy Robert Duncan testified, “Well, when he ran from us ... [.] We didn’t necessarily get out to even talk to him.” Dep. Duncan was asked, ‘Was the fact that he ran the only reason he incurred your suspicion?” The deputy responded, “In the beginning, yes, I would say so.” He then indicated that the task force members probably would have conducted a citizen’s encounter. However, Dep. Duncan stated that he would not have initiated the encounter because he did not know Rho-den. The deputy admitted that there was nothing suspicious about talking on a cell phone and he did not know if Rhoden had been walking briskly away from the area before their vehicle turned the corner and he was observed.
In his motion, Rhoden argued that the task force members’ actions in parking and jumping out of the Ford Explorer provoked nervousness on Rhoden’s part which caused him to flee, or in the alternative, the task force members took advantage of *8 Rhoden’s nervousness to provoke his flight. Rhoden asserted that because the task force members provoked his flight, they lacked genuine reasonable suspicion to justify their pursuit of him.
In ruling on the motion, the trial court noted that Rhoden was located in a high crime area. “That the Defendant, Mr. Rhoden, fled. That the police officers got out, identified themselves as police officers. They had badges that they took out.” The lights and siren on the unmarked vehicle were activated and a chase ensued. The trial court concluded that the task force members had the right to take Rhoden into custody. The decision to deny the motion to suppress was based on the rationale in Illinois v. Wardlow, 528 U.S. 119, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000).
A trial court’s ruling on a motion to suppress is clothed with a presumption of correctness with regard to determinations of historical fact. A reviewing court must defer to the factual findings of the trial court that are supported by competent, substantial evidence. Bautista v. State, 902 So.2d 312, 313-14 (Fla. 2d DCA 2005). However, the decision of whether the application of the law to the historical facts has established an adequate basis for the trial court’s ruling is subject to de novo review. Fitzpatrick v. State, 900 So.2d 495, 513 (Fla.2005).
In conducting our de novo review, we conclude that while the trial court’s factual findings are supported by the evidence, its application of the law to the facts in the present case was erroneous because the task force members’ testimony demonstrated nothing more than a hunch that criminal activity might be afoot. They were unable to articulate a valid basis for their suspicion that Rhoden had committed, was committing, or was about to commit a crime. See § 901.151, Fla. Stat. (2003); Williams v. State, 910 So.2d 368, 370 (Fla. 5th DCA 2005).
The Wardlow decision, upon which the trial court relied, is totally distinguishable. In Wardlow, uniformed police officers in a caravan of four marked police vehicles arrived in an area known for heavy narcotics trafficking in order to investigate drug transactions. The officers expected to find a crowd of people including customers and lookouts. Id. at 121, 120 S.Ct. 673. As the caravan passed, an officer noticed Wardlow standing beside a building holding an opaque bag. Wardlow looked in the direction of the officers and fled. Two officers chased Wardlow in their marked police vehicle and apprehended him. The officers conducted a protective patdown for weapons and discovered a firearm. The trial court denied Wardlow’s motion to suppress and held that the weapon had been recovered during a lawful stop and frisk. Id. at 122, 120 S.Ct. 673.
The Illinois appellate court reversed the trial court, and the Illinois Supreme Court upheld the reversal. The United States Supreme Court granted cer-tiorari and reversed the Illinois Supreme Court. It concluded that an individual’s presence in a high crime area standing alone was not enough to support a reasonable, particularized suspicion that a person was committing a crime to warrant a brief, investigatory stop pursuant to Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). It further concluded, however, that the fact that the stop occurred in a high crime area is among the relevant contextual considerations in a Terry analysis. Wardlow, 528 U.S. at 124, 120 S.Ct. 673. The Supreme Court then found that it was not merely Wardlow’s presence in an area of heavy narcotics trafficking that aroused the officers’ suspicion but his unprovoked flight upon noticing the marked *9 police vehicle and the officers in their uniforms. “The determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior.” Id. at 125, 120 S.Ct. 673. The Supreme Court acknowledged that the conduct justifying a stop could be ambiguous and susceptible of an innocent explanation. It concluded that while the conduct by itself could be lawful, if it is ambiguous and could also be interpreted as criminal activity, for example when it appears individuals are casing a store for a planned robbery, the officers could detain the individual to resolve the ambiguity. Id. at 125, 120 S.Ct. 673.
In the present case, Rhoden was walking down the street at 1 p.m. in an area identified as a high crime area. The fact that Rhoden kept looking back at the unmarked vehicle following him was not an ambiguous act because it was not suggestive of criminal behavior. See Terry, 392 U.S. at 5-6, 88 S.Ct. 1868 (holding where conduct articulated as justification for the stop is ambiguous and susceptible of an innocent explanation, if it also suggests criminal activity, then detention to resolve the ambiguity does not violate the Fourth Amendment). The task force members had no expectation of finding criminal activity in that specific location, as in Ward-loiv, and there had been no reports of criminal activity to which they were responding.
At the time the task force members observed Rhoden, he was talking on a cell phone and was already walking at a brisk pace in the same direction in which their vehicle was traveling. Unlike the caravan of four marked police vehicles in Wardlow, in the present case there was only a single, unmarked law enforcement vehicle. Although the task force members testified that the vehicle was known in the area, they could not say that Rhoden knew it was a law enforcement vehicle. Further, unlike the uniformed officers in Wardloiv, the task force members were dressed in street clothes, and nothing on their persons identified them as law enforcement officers before they exited the vehicle and began to pursue Rhoden. As they exited the vehicle, after Rhoden already had taken flight, they activated the lights and siren and displayed their badges on the outside of their clothing.
At the hearing on the motion to suppress, the task force members all conceded that talking on a cell phone while briskly walking down a street was not sufficient to provide reasonable suspicion that the individual committed, was committing, or was about to commit a crime as is required to detain an individual for investigative purposes. One deputy testified that he could see that Rhoden had something in his hand as he was walking down the street talking on the cell phone but confessed that he had no idea what the object was. The only alleged suspicious activity identified was that Rhoden kept looking back at the unmarked vehicle with interest. The task force members indicated that Rhoden kept making “eye contact” with the vehicle but did not make eye contact with the occupants of the vehicle.
We hold that under the specific facts of the present case it is clear that Rhoden’s action of fleeing was not unprovoked flight at the sight of law enforcement. The State offered nothing but speculation to support its assertion that Rhoden knew the unmarked Ford Explorer was a law enforcement vehicle. We are loathe to expand the holding in Wardlow to include a situation such as that before us today.
Because the officers did not have the reasonable suspicion necessary to authorize an investigatory stop after Rhoden’s provoked flight, the initial detention was illegal and the resulting acquisition of the *10 cocaine and Tylenol bottle (drug paraphernalia) was the fruit of an unconstitutional seizure. See, e.g., Jay v. State, 731 So.2d 774, 776-77 (Fla. 4th DCA 1999). Accordingly, we reverse the order denying Rho-den’s motion to suppress and remand for further proceedings.
Reversed and remanded.
KELLY, J., Concurs.
WHATLEY, J., Dissents with opinion.

. Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

. The task force members testified that the Ford Explorer was commonly used by task force members in the area to make citizen encounters. It was not an undercover vehicle. The officers testified that the vehicle was known in the community to be a law enforcement vehicle. There was no evidence presented to demonstrate that Rhoden was aware that the Ford Explorer was a law enforcement vehicle.

. Deputy Robert Duncan testified, "[A]s they got out of the car they took that badge on the outside, which is what we always do.”

.Testimony was presented that a member of the team, Investigator Ryan Magnuson, recognized the man from a prior citizen encounter. At that time Rhoden had been stopped due to mistaken identification. This encounter had lasted two or three minutes a few weeks earlier. Dep. Duncan testified that after Inv. Mag-nuson exited the vehicle he called out Rho-den's name and ordered him to stop. The deputy, who remained inside the vehicle, testified that he could not say how loudly Inv. Magnuson called out Rhoden’s name because the door to the vehicle was closed after Inv. Magnuson exited.

. The deputies testified that "the instant that the door cracked [Rhoden] took off." Dep. Duncan was asked, "Now were you able to see whether or not Mr. Rhoden was looking at the car or away from the car when the door was open?” The deputy responded, "Yes sir, he was looking right at him.” Although the dissent indicates that the deputy testified that Rhoden was looking directly at Inv. Magnuson, the deputy's testimony in this regard is not clear and he did not clarify the "him” to whom he referred.