25 So.3d 600 (2009)
Fulvio REGALADO, Appellant,
v.
STATE of Florida, Appellee.
No. 4D08-1609.
District Court of Appeal of Florida, Fourth District.
December 16, 2009.
Rehearing Denied February 10, 2010.
*601 Samuel S. Fields of Ruden, McClosky, Smith, Schuster & Russell, P.A., Fort Lauderdale, for appellant.
Bill McCollum, Attorney General, Tallahassee, and August A. Bonavita, Assistant Attorney General, West Palm Beach, for appellee.
WARNER, J.
Fulvio Regalado appeals his conviction and sentence for carrying a concealed weapon, contending that the trial court erred in denying his dispositive motion to suppress. Because it is legal to carry a concealed weapon in Florida, if one has a permit to do so, and no information of suspicious criminal activity was provided to the officer other than appellant's possession of a gun, the mere possession of a weapon, without more, cannot justify a Terry stop. The court erred in denying the motion to suppress. We reverse the conviction.
In the early hours of one morning, Officer Jeffrey Castro was finishing an off-duty detail in downtown Fort Lauderdale. He was in uniform and just getting into his police cruiser when a man approached him and said that "some guy was over there flashing his gun to a couple of friends." The informant explained that a man in a restaurant had raised his shirt, exposing the gun in his waistband to his friends at the table. He did not take the gun out of his waistband. The officer asked the informant to give him a description of the person who exposed the weapon. The informant provided the officer with a description of the man with the gun. As they were talking, appellant Regalado walked by, and the informant identified him as the man with the gun in the restaurant. Officer Castro asked the informant for his name, but he refused because he was scared. The informant then took off. In court the officer identified Regalado as the person who was pointed out to him by the informant.
Officer Castro then called dispatch and asked for more units to assist him. He noticed Regalado start to walk south on 1st Avenue in the Riverfront area. Despite the time, there was still a heavy crowd in the area. Castro started to follow Regalado. As the officer got within six or eight feet, he could see Regalado turn and look around. The officer observed a bulge in the suspect's waistband, which, from his training and experience, he believed was the butt of a pistol or handgun. Because Regalado and the friend with whom he was walking began to blend into the crowd, for the safety of the citizens *602 of Fort Lauderdale and himself, the officer pulled his service weapon and called to the suspect at gunpoint, ordering him to the ground. Both Regalado and his friend complied. The officer patted down Regalado's shirt, felt the firearm, recognized it, and took it out. On cross-examination, the officer admitted that it is not against the law to carry a firearm and that when he ordered Regalado to the ground he was not free to leave. Regalado had not threatened the officer, nor had the officer seen Regalado threaten anyone else. The informant had not reported that Regalado had threatened anyone with a gun. The officer had not observed any crime take place.
The trial court denied the motion to suppress relying on Baptiste v. State, 959 So.2d 815 (Fla. 3d DCA 2007) (Baptiste I), in which the Third District held that a stop was permissible based upon a tip that a firearm was being openly displayed, when an anonymous informant revealed himself to the officers after the defendant was stopped but before the pat-down. After the denial of the motion, Regalado pled to the charge, reserving his right to appeal the denial of the motion to suppress.
Regalado appeals claiming the stop violated the Fourth Amendment. While much of the argument focuses on the status of the anonymous informant, we address the issue of whether the stop met the Terry requirements. We conclude that it did not.
Florida recognizes three levels of police citizen encounters: 1) a consensual encounter involving minimal contact during which the citizen is free to leave; 2) an investigatory stop which requires a well-founded suspicion of criminal activity; and 3) an arrest supported by probable cause that a crime has been committed, or is being committed. Popple v. State, 626 So.2d 185, 186 (Fla.1993). In order to justify an investigatory stop, police must possess specific, articulable facts that would warrant a man of reasonable caution in the belief that a person has committed, is committing, or is about to commit a crime. Id.; § 901.151, Fla. Stat.
The trial court relied on Baptiste I which was later reviewed and reversed by the supreme court. See Baptiste v. State, 995 So.2d 285 (Fla.2008) (Baptiste II). The state maintains that the supreme court's opinion in Baptiste II, however, would still support the denial of the motion to suppress based upon the facts of this case. We disagree that its reasoning would support the validity of the stop.
In Baptiste an anonymous informant called 911 to report that a man was waving a firearm in front of a grocery store. The first police officer to arrive on the scene saw Baptiste, who matched the description given by the informant, walking down the street with no visible gun. She stopped him at gunpoint. A second officer arrived and the two officers together ordered Baptiste to the ground. A person then approached the officers, indicating that he was the one who had called. He refused to give his name but confirmed that the person being held at gunpoint was the person identified in his anonymous call. The informant then left and was never identified. The officers patted Baptiste down. Baptiste told them he had a handgun, which they found in his front pocket. Baptiste was charged with unlawful possession of a firearm by a convicted felon and filed a motion to suppress, contending that the information provided in the anonymous tip was insufficient to establish a reasonable suspicion to detain him.
Key to the application of Baptiste II to this case is the fact that the officers there had received information from dispatch reporting a man waving a gun in front of a *603 grocery store. The improper exhibition of a weapon is a crime. See § 790.10, Fla. Stat. ("[i]f any person having or carrying any . . . firearm . . . shall, in the presence of one or more persons, exhibit the same in a rude, careless, angry, or threatening manner, not in necessary self-defense, the person so offending shall be guilty of a misdemeanor of the first degree"). Thus, the tip in Baptiste related criminal activity. The officers investigated and saw Baptiste walking down the street. They observed no suspicious behavior. Nevertheless, because of the report of the defendant brandishing the gun, one of the officers drew her gun and ordered Baptiste on the ground. After Baptiste was stopped, an unknown person emerged to say that he had called in the report. He then disappeared.
The Baptiste II court analyzed the case under the principles of Terry v. Ohio, 392 U.S. 1, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), in which the Supreme Court held:
[W]here a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him.
Reasonable suspicion of criminal activity may arise from tips that law enforcement receives, but whether tips can provide reasonable suspicion depends upon both the quantity and quality of the information, or its degree of reliability. See Alabama v. White, 496 U.S. 325, 330, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990).
The Baptiste II court determined that the tip called into 911 regarding the man waving his gun in front of the grocery store was an anonymous tip, because the tipster did not reveal himself to the police until after Baptiste was stopped. The court thus distinguished the tip in Baptiste from a citizen informant tip where a citizen approaches the police with information before the police encounter the suspect. Nevertheless, the court stressed that the information supplied by the tipster must be of illegal activity to constitute reliable information for investigation:
State and federal case law establishes that the reliability of a tip which alleges illegal activity varies based upon whether the tip is truly anonymous, such as an anonymous telephone call, or whether it is offered by a "citizen informant" who approaches the police in person to report criminal activity. A tip from a citizen informant falls at a higher end of the reliability scale. See State v. Maynard, 783 So.2d 226, 228 (Fla.2001).
Baptiste II, 995 So.2d at 291 (emphasis supplied). The court looked to Florida v. J.L., 529 U.S. 266, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000), which involved a truly anonymous tip that a juvenile standing at a bus stop had a gun. The possession of a gun by a juvenile is a crime in Florida. When officers checked out the tip, they observed the juvenile matching the description given in the tip but observed no suspicious behavior. The Supreme Court held that the Terry stop violated the Fourth Amendment. In doing so, the Court noted, "The reasonable suspicion here at issue requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person." *604 J.L., 529 U.S. at 272, 120 S.Ct. 1375 (emphasis supplied). Following J.L., the Baptiste II court held that the stop in that case was illegal because, after having received an anonymous tip of illegal activity, the officers observed no suspicious conduct which would provide reasonable grounds to believe illegal activity was occurring. In dicta the court noted that the officers had not observed any other illegal or suspicious conduct, and they had not observed a firearm or bulge in his clothing. Baptiste II, 995 So.2d at 298. The state seizes on this dicta to claim that the officer in this case had sufficient facts to support a reasonable suspicion stop, because he had observed a bulge in the clothing which looked like a gun. We disagree.
The facts of this case differ from Baptiste. The tipster here was somewhat less than a citizen informant who provides some identification, but he was more than a completely anonymous tipster who has no face-to-face contact with the police. He approached the officer and told him that the defendant had shown a gun to friends in a restaurant. However, he did not state that the defendant ever took the gun out of his waistband.
In other words, the only information received by the officer was that the individual had a gun. Possession of a gun is not illegal in Florida. Even if it is concealed, it is not illegal if the carrier has obtained a concealed weapons permit. Although the officer observed a bulge in Regalado's waistband, which in his experience looked like a gun, no facts and circumstances were presented to show that Regalado's carrying of a concealed weapon was without a permit and thus illegal.
The officer admitted in his testimony at the suppression hearing that he had not observed any criminal behavior. He did not see the defendant threaten anyone with a gun, nor had the anonymous tipster mentioned the defendant threatening anyone with a gun or even removing it from his pants. The officer did not observe any threatening act against him, which might provide sufficient reasonable suspicion of an assault to permit a Terry stop. See Baptiste II, 995 So.2d at 297 (citing United States v. Gooden, 273 F.3d 1100, 1100 (5th Cir.2001)) (unpublished opinion) (after anonymous tip of gun possession, when officer encountered suspect, the suspect reached in his waistband as if grabbing for a gun). The officer also did not know whether the defendant had a permit for carrying a concealed weapon. The officer had no reasonable suspicion of any criminal activity. The tipster had not reported any illegal activity, and the officer observed no conduct which would constitute a crime or impending crime.
This case is most like United States v. Ubiles, 224 F.3d 213 (3d Cir.2000). During a carnival celebration in the U.S. Virgin Islands an elderly gentleman reported to a police officer that a young man in the crowd had a gun. The tipster then disappeared. The officer approached the young man but observed no suspicious behavior. Nevertheless, he frisked the defendant, finding an unregistered firearm. The defendant was charged with possession of an unregistered firearm. He filed a motion to suppress, contending his seizure and search were illegal, which the trial court denied.
The Third Circuit reversed the denial of the motion to suppress. The court emphasized the Terry requirement that the officer have reasonable suspicion of criminal activity. A reasonable suspicion of criminal activity may result from viewing exclusively legal activity, but it depends upon the totality of the circumstances. It cited to Illinois v. Wardlow, 528 U.S. 119, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000), where the Supreme Court held that headlong *605 flight from police officers in a high crime area noted for narcotics could constitute reasonable suspicion of criminal activity.
Analyzing the evidence, the court determined that the officer did not have reasonable suspicion of criminal activity, because possession of a firearm was not illegal in the U.S. Virgin Islands. Although possession of an unregistered or defaced firearm would be a crime, the officer possessed no information which would suggest that the gun was unregistered. Therefore, the authorities had no reason to believe that the defendant was planning or had participated in criminal activity merely based upon his possession of a gun.
In contrast to Ubiles, the Third Circuit found reasonable suspicion to support a Terry stop in another case with a tipster similar to the one in this case. In United States v. Valentine, 232 F.3d 350 (3d Cir. 2000), an anonymous person approached officers saying he had just seen the defendant with a gun. After discussing the reliability of the tipster, the court looked at the larger context of the report to determine whether the officers had reasonable suspicion to stop the defendant. There, the defendant was walking around at 1:00 a.m. in a high crime area where reports of shootings were common. When the officers stopped to investigate and asked Valentine to approach, he ran and an officer tackled him. According to Wardlow, such circumstances, including flight, provide reasonable suspicion to conduct a Terry stop.
Valentine, of course, is distinguishable from the present case. Whereas the officers encountered Valentine in a high crime area known for its shootings, the officer saw Regalado amidst a crowd in downtown Fort Lauderdale along the Riverfront. There is no information in this record that the Riverfront is considered a high crime area. Furthermore, the defendant did not attempt to flee when approached by the officer. In fact, the officer did not stop to investigate, he ordered the defendant to the ground at gunpoint.
While there are several cases from the United States D.C. Circuit, which hold that an officer has reasonable suspicion to conduct a Terry stop based upon an anonymous tip that a suspect is armed, all of these occurred in the District of Columbia, where, at least until the Supreme Court's decision in District of Columbia v. Heller, ___ U.S. ___, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008), possession of a hand gun was illegal. See, e.g., U.S. v. Holmes, 360 F.3d 1339 (D.C.Cir.2004), vacated and remanded on other grounds, 543 U.S. 1098, 125 S.Ct. 1046, 160 L.Ed.2d 992 (2005); U.S. v. Thompson, 234 F.3d 725 (D.C.Cir.2000). In Florida, possession of a handgun is legal, so long as the person has a concealed weapons permit.
Frequently, the state has argued for a firearms exception to the requirements of a Terry stop. However, our supreme court rejected such an exception in J.L. v. State, 727 So.2d 204, 208-09 (Fla.1998), affd Florida v. J.L., 529 U.S. 266, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000), where it stated:
We are aware that other jurisdictions appear to recognize a "firearm exception" to the reasonable suspicion test. See United States v. DeBerry, 76 F.3d 884 (7th Cir.1996) (holding that evidence is admissible based on mere verification of a presently-occurring innocent detail tip); United States v. Clipper, 973 F.2d 944 (D.C.Cir.1992) (same). We join the Supreme Court of Pennsylvania in rejecting this exception:
The Commonwealth takes the radical position that police have a duty to stop and frisk when they receive information from any source that a suspect has a gun. Since it is not illegal *606 to carry a licensed gun in Pennsylvania, it is difficult to see where this shocking idea originates, notwithstanding the Commonwealth's fanciful and histrionic references to maniacs who may spray schoolyards with gunfire and assassins of public figures who may otherwise go undetected. Even if the Constitution of Pennsylvania would permit such invasive police activity as the Commonwealth proposes-which it does not-such activity seems more likely to endanger than to protect the public. Unnecessary police intervention, by definition, produces the possibility of conflict where none need exist.
Commonwealth v. Hawkins, 547 Pa. 652, 692 A.2d 1068, 1071 (Pa.1997). In Florida, it is generally not illegal to possess a firearm. See generally ch. 790, Fla. Stat. (1997). Additionally, Florida provides that individuals are permitted to carry concealed weapons with a proper license. See § 790.06, Fla. Stat. (1997). There are even certain situations (not involved here) where juveniles are permitted to possess firearms. See § 790.22, Fla. Stat. (1997).
For the reasons stated herein, we determine that there is no firearm or weapons exception to the Fourth Amendment and the bare-boned anonymous tip involved herein, by itself, did not provide the police with sufficient cause to stop and frisk.
(footnotes omitted).[1],[2] Despite the obvious potential danger to officers and the public by a person in possession of a concealed gun in a crowd, this is not illegal in Florida unless the person does not have a concealed weapons permit, a fact that an officer cannot glean by mere observation. Based upon our understanding of both Florida and United States Supreme Court precedent, stopping a person solely on the ground that the individual possesses a gun violates the Fourth Amendment.[3] In this *607 case, neither the anonymous tip nor the officer's observations revealed any suspicion of past, present, or future criminal activity. Therefore, there was no authority for the officer to pull his gun and order the defendant to the ground.
We reverse. Because the issue was dispositive, we direct that appellant's conviction and sentence be vacated.
GROSS, C.J., concurs.
CIKLIN, J., dissents with opinion.
CIKLIN, J., dissenting.
I must respectfully dissent. Regalado's pizza restaurant handgun exhibition as reported by the tipster, coupled with the observations made by Officer Castro, did constitute, under the totality-of-the-circumstances analysis, a reasonable suspicion justifying a Terry stop. Furthermore, the open display of a weapon, regardless of whether an individual holds a concealed weapons permit, is an illegal activity which might justify a stop. The trial court was correct when it denied Regalado's motion to suppress.
The majority seems to hinge its opinion on the question of whether Regalado's flashing of his handgun in a pizza parlor was in and of itself illegal. While I believe the law prohibits what Regalado did in the restaurant, illegal conduct is not the exclusive starting point in a Fourth Amendment analysiseven when a Terry stop originates with an anonymous tip. Fourth Amendment analysis begins with "a wellfounded, articulable suspicion of criminal activity""a reasonable suspicion that a person has committed, is committing, or is about to commit a crime." Popple v. State, 626 So.2d 185, 186 (Fla.1993). The flashing of a gun is simply one of the many factors to be considered in ascertaining the required "suspicion" for a Terry stop. The body of caselaw in this area utilizes a totality-of-the-circumstances analysis in consideration of a proper stop. See Alabama v. White, 496 U.S. 325, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990) (holding an anonymous tip may be sufficiently corroborated by the observations of officers in the field to serve as a basis for an investigatory stop); Cox v. State, 975 So.2d 1163, 1167 (Fla. 1st DCA 2008) ("The articulable, reasonable suspicion necessary to justify a lawful investigatory stop or detention is `not readily, or even usefully, reduced to a neat set of legal rules,' and the courts must consider the totality of the circumstances." (citations omitted)); Lee v. State, 868 So.2d 577, 580 (Fla. 4th DCA 2004) ("While an anonymous tip can provide the basis for an investigatory stop, the tip must contain sufficient indicia of reliability to furnish the police with reasonable suspicion that defendant is engaged in criminal activity; such reliability is judged by (a) its specificity and (b) independent police corroboration of significant aspects of the informant's predictions." (citations omitted)); Grant v. State, 718 So.2d 238, 239 (Fla. 2d DCA 1998) ("Factors that may be considered [in determining an officer's reasonable suspicion of criminal activity to justify an investigatory stop] include: the time of day; the appearance and behavior of the suspect; the appearance and manner of operation of any vehicle involved; and anything incongruous or unusual in *608 the situation as interpreted in light of the officer's knowledge." (citation omitted)); Burnette v. State, 658 So.2d 1170, 1171 (Fla. 2d DCA 1995) (Factors important to assess whether to approve a stop and search by an officer who has not actually seen money or drugs exchange hands in a drive-up situation include "the officer's narcotics experience; the reputation of the location for drive-up transactions; the extended period of surveillance; and the history of previous multiple arrests from that site."); State v. Wise, 603 So.2d 61, 63 (Fla. 2d DCA 1992) (discussing factors bearing on whether officer has reasonable suspicion to conduct a stop pursuant to a be-on-the-lookout report, including amount of time since offense, distance from offense, specificity of description of vehicle and occupants, and source of BOLO information); Steele v. State, 561 So.2d 638, 641 (Fla. 1st DCA 1990) ("The reasonableness of the officer's suspicion must be based on the totality of the circumstances, encompassing such factors as the time of day, the locale of the stop, the appearance and behavior of the suspect, and the officer's training and experience." (citations omitted)).
Indeed, most cases discuss "reasonable suspicion" to initiate a Terry stop as requiring an unlawful act or unusual conduct or suspicious behavior or a combination of these factors. This is an accumulative analysis not dependent on one single fact.
The majority's concentration on whether Regalado's initial weapon exhibition was illegal or not, is, I respectfully submit, not the determining factor in our analysis. If there is any central theme to the decisional law that has developed in this area, it is this:
In reviewing the propriety of an officer's conduct, courts do not have available empirical studies dealing with inferences drawn from suspicious behavior, and we cannot reasonably demand scientific certainty from judges or law enforcement officers where none exists. Thus, the determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior.
. . . .
In allowing such detentions, Terry accepts the risk that officers may stop innocent people. Indeed, the Fourth Amendment accepts that risk in connection with more drastic police action; persons arrested and detained on probable cause to believe they have committed a crime may turn out to be innocent. The Terry stop is a far more minimal intrusion, simply allowing the officer to briefly investigate further. If the officer does not learn facts rising to the level of probable cause, the individual must be allowed to go on his way.
Illinois v. Wardlow, 528 U.S. 119, 124-25, 126, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000) (citations omitted).
Under a totality-of-the-circumstances analysis, it is clear that the trial court was correct when it denied Regalado's motion to suppress.
Unlike the facts in J.L., Ubiles, and Baptiste II, as cited by the majority to support its decision, the facts of this case provided Officer Castro with a reasonable suspicion to conduct a stop to investigate what, at the very least, was unusual conduct or suspicious behavior. In the instant matter, we have a tipster's report of a person with a gun tucked into his waistband showing off the weapon to his friends in a pizza restaurant. We have a face to face conversation between the tipster and the investigative officer with the tipster specifically pointing out the gun flashing suspect before the stop. We have the investigating police officer maintaining visual contact with the suspect from the instant *609 the tipster pointed him out until the investigating officer conducted the Terry stop. We have furtive movement by the suspect blending into a large crowd of Riverfront patrons who, as observed by Officer Castro and in the words of the officer, was "looking back and forth and back and forth." We have a police officer who was within six to eight feet of an alleged gun toting suspect with a bulge under his shirt who, based on the training, experience, and opinion of Officer Castro, was most likely carrying a firearm in his waistband. In other words, Regalado was not stopped solely because he might be in possession of a gun.
The majority also emphasizes the possibility that Regalado may have had a concealed weapons permit, the lack of which, the majority urges "cannot [be] glean[ed] by mere observation." To suggest that an officer must engage in an analysis as to whether a gun wielding suspect might possess a concealed weapons permit, which cannot be readily observed, is a dangerous premise. Indeed, in Terry v. Ohio, 392 U.S. at 23-24, 88 S.Ct. 1868 the United States Supreme Court clearly indicated the need to ensure safety of law enforcement officers:
. . . [I]t would be unreasonable to require that police officers take unnecessary risks in the performance of their duties. American criminals have a long tradition of armed violence, and every year in this country many law enforcement officers are killed in the line of duty, and thousands more are wounded. Virtually all of these deaths and a substantial portion of the injuries are inflicted with guns and knives.
In view of these facts, we cannot blind ourselves to the need for law enforcement officers to protect themselves and other prospective victims of violence in situations where they may lack probable cause for an arrest. When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm.
(footnote omitted).
Even if Officer Castro had been required to consider whether Regalado had a concealed weapons permit, it does not change the fact that there was the equal possibility that the defendant did not have a permit:
Even in Terry, the conduct justifying the stop was ambiguous and susceptible for an innocent explanation. The officer observed two individuals pacing back and forth in front of a store, peering into the window and periodically conferring. All of this conduct was by itself lawful, but it also suggested that the individuals were casing the store for a planned robbery. Terry recognized that the officers could detain the individuals to resolve the ambiguity.
Wardlow, 528 U.S. at 125, 120 S.Ct. 673 (citations omitted).
Assume, for argument's sake, that the majority is correct in suggesting that a report of illegal conduct was necessary in this case before Officer Castro could effectuate a stop. Section 790.053(1), Florida Statutes (2008), prohibits "any person to openly carry on or about his or her person any firearm." See also § 790.10, Fla. Stat. ("If any person having or carrying any . . . firearm . . . shall, in the presence of one or more persons, exhibit the same in a rude, careless, angry, or threatening manner, not in necessary self-defense, the person so offending shall be guilty of a misdemeanor *610 of the first degree."). The majority is correct that a person may obtain a license to carry a concealed weapon, but that protection only extends so long as the gun is concealed. § 790.06(1), Fla. Stat. ("The Department of Agriculture and Consumer Services is authorized to issue licenses to carry concealed weapons or concealed firearms."). A concealed weapon is defined to include a deadly weapon "carried on or about a person in such a manner as to conceal the weapon from the ordinary sight of another person." § 790.001(3)(a), Fla. Stat. Openly showing a gun to another person violates section 790.053(1), Fla. Stat., whether or not the owner has a license to carry a concealed weapon. See Op. Att'y Gen. Fla. 91-36 (1991) ("Thus, the possession of a concealed weapons license does not authorize a person to openly carry a weapon."). I believe Regalado's improper exhibition of the gun that he had stuck in his pants was an illegal activity.
So while I obviously disagree with the majority's contention that only a tip of illegal conduct can lead to a constitutionally permitted Terry stop, Regalado's alleged and potentially dangerous gun exhibition was just that. And whether Regalado may have been issued and continued to possess a valid concealed weapons permit is, on many different levels, of little import.
With well due and utmost respect to my colleagues in the majority, I dissent. This was a "good stop" and the trial court's denial of Regalado's motion to suppress should be affirmed.
NOTES
[1] We cannot help but comment that the court's reference to "fanciful and histrionic references to maniacs who may spray schoolyards with gunfire and assassins of public figures" noted in the 1997 opinion in Commonwealth v. Hawkins, unfortunately is not fanciful at all in the present day.
[2] In affirming our supreme court's decision in J.L. the United States Supreme Court also refused to create a "firearm's exception" to the Fourth Amendment:

Firearms are dangerous, and extraordinary dangers sometimes justify unusual precautions. Our decisions recognize the serious threat that armed criminals pose to public safety; Terry's rule, which permits protective police searches on the basis of reasonable suspicion rather than demanding that officers meet the higher standard of probable cause, responds to this very concern. See 392 U.S. at 30, 88 S.Ct. 1868. But an automatic firearm exception to our established reliability analysis would rove too far. Such an exception would enable any person seeking to harass another to set in motion an intrusive, embarrassing police search of the targeted person simply by placing an anonymous call falsely reporting the target's unlawful carriage of a gun. Nor could one securely confine such an exception to allegations involving firearms. . . . As we clarified when we made indicia of reliability critical in Adams and White, the Fourth Amendment is not so easily satisfied. Cf. Richards v. Wisconsin, 520 U.S. 385, 393-394, 117 S.Ct. 1416, 137 L.Ed.2d 615 (1997) (rejecting a per se exception to the "knock and announce" rule for narcotics cases partly because "the reasons for creating an exception in one category [of Fourth Amendment cases] can, relatively easily, be applied to others," thus allowing the exception to swallow the rule).
J.L., 529 U.S. at 272-73, 120 S.Ct. 1375.
[3] The dissent suggests that Regalado may have violated section 790.053(1), Florida Statutes, by "openly carry[ing]" a gun. We disagree. The gun in question was tucked in Regalado's waistband and covered by his shirt. Openly carrying a weapon is the opposite of carrying a concealed weapon, which is defined as to be "in such a manner as to conceal the weapon from the ordinary sight of another person." Here, the weapon was only revealed when Regalado allegedly raised his shirt to show his friends. At most, he "displayed" his gun to his friends. That is a crime only if it is done in a "rude, careless, angry, or threatening manner." § 790.10, Fla. Stat. To the extent that "openly carry" is susceptible of different constructions, we construe it "most favorably to the accused." § 775.021(1), Fla. Stat. To follow this rule of construction, we cannot construe "openly carry" as being synonymous with "display" or "exhibit."