LEWIS, J.
This case is before the Court for review of the decision of the Third District Court of Appeal in Mackey v. State, 83 So.3d 942 (Fla. 3d DCA 2012). The Third District certified that its decision is in express and direct conflict with the decision of the Fourth District Court of Appeal in Regalado v. State, 25 So.3d 600 (Fla. 4th DCA 2009). We have jurisdiction. See art. V, § 3(b)(4), Fla. Const.
FACTS AND BACKGROUND
On March 6, 2010, Officer Alexander May of the Miami Police Department was patrolling in a marked police car during daytime hours in the . Overtown area of Miami. Officer May drove by the location of Northwest 2nd Avenue and 12th Street — an area, according to Officer May, that is known for firearms and narcotics. Officer May explained that he “lookfs] at a lot of hand motions and waistbands and pockets in this line of work, especially in that area.” While driving slowly, Officer May observed Anthony Mackey standing on one side of a fence. At that time, Officer May noticed that:
[Mackey’s] right pocket looked like it was — it was something, a big mass, like a big solid thing in his pocket. And then I looked and it was like a piece of the handle sticking out. Not much, but a piece enough for me to identify a firearm.
Officer May stated that his ability to identify the item in Mackey’s pocket as a firearm was based upon his training and experience.
Officer May exited the patrol car and approached Mackey. During a deposition, Officer May explained that he did not draw his service weapon because he was able to observe Mackey’s hands. According to Officer May:
I asked him if he had anything on him. He said no, which I already kind of knew. And I asked him if I could pat him down for weapons.[1] I pat him down. I grab — retrieved the firearm.[2] I asked him why don’t you tell me about this. And he just shook his head, put, you know, hands behind his back.
Officer May then asked Mackey if he possessed a concealed weapons license, and Mackey answered in the negative. Thereafter, Officer May, and another officer who stopped to assist, arrested Mackey. Further investigation revealed that a bullet was in the chamber of the firearm. Officer May later confirmed that he had never met Mackey before this incident. On March 29, 2010, the State filed an information charging Mackey with carrying a concealed firearm and possession of a firearm by a convicted felon.[3]
' Mackey subsequently filed a motion asking the trial court to suppress (1) the firearm, (2) Mackey’s identity as a convicted felon, and (3) any statements he made after he was detained by police, alleging two bases for suppression. First, he claimed that the firearm was not concealed. Second, and specifically relevant to the certified conflict, Mackey alleged that even if the firearm was concealed for purposes of the statute prohibiting the carrying of a concealed firearm, Officer May lacked reasonable suspicion to conduct the *180 investigatory stop — also referred to as a Terry[4] stop — because no facts or circumstances indicated that Mackey did not possess a license to carry the firearm. Mack-ey asserted that because the observations by Officer May did not reveal any suspicion of criminal activity, there was no legal basis for Officer May to conduct the Terry stop. In contending that suppression was required, Mackey relied upon the decision of the Fourth District Court of Appeal in Regalado v. State, 25 So.3d 600 (Fla. 4th DCA 2009).
In Regalado, a person approached a police officer and informed him that “some guy” at a restaurant had raised his shirt and showed his companions a firearm in the waistband of his pants. 25 So.3d at 601. The defendant, Fulvio Regalado, subsequently walked by, and the person identified Regalado as the man who had been “flashing his gun.” Id. When the officer asked the person his name, the person refused to identify himself and departed out of fear. Id. The officer proceeded to follow Regalado and eventually observed a bulge in Regalado’s waistband that the officer believed was the butt of a handgun. Id. Since Regalado was walking in a crowded area and had begun to blend into the crowd, the officer removed his weapon and ordered Regalado to the ground at gunpoint. Id. at 601-02. Rega-lado complied, and upon frisking him, the officer located and seized a firearm. Id. at 602. During the criminal proceedings that ensued, the trial court denied a motion to suppress the firearm, and Regalado was subsequently convicted of carrying a concealed weapon. Id. at 601.
On appeal, the Fourth District vacated Regalado’s conviction and sentence, holding that the trial court erred when it denied the motion to suppress. Id. at 607. The Fourth District explained:
Because it is legal to carry a concealed weapon in Florida, if one has a permit to do so, and no information of suspicious criminal activity was provided to the officer other than appellant’s possession of a gun, the mere possession of a weapon, without more, cannot justify a Terry stop.
Id. at 601. The Fourth District noted that even though the officer observed a bulge in the waistband of Regalado’s pants, which in the experience of the officer looked like a firearm, no facts were presented to demonstrate that Regalado did not possess a license to carry a concealed weapon. Id. at 604. The Fourth District also concluded that the officer had no reasonable suspicion of criminal activity and had not observed any conduct that would constitute a crime or an impending crime. Id. Based on the foregoing, the Fourth District held that the officer lacked the authority to conduct a Terry stop of Regalado and, therefore, the search and seizure violated the Fourth Amendment. Id. at 606-07.
During the hearing on Mackey’s motion to suppress, the trial court concluded that it was not bound by the decision in Regala-do because the Third District Court of Appeal had previously held in Hernandez v. State, 289 So.2d 16, 17 (Fla. 3d DCA 1974), that an arrest for the offense of possession of a concealed weapon was proper where the officer observed a firearm partially protruding from a pocket in the defendant’s pants. The trial court denied the motion to suppress, and later denied a motion for rehearing. Mackey ultimately pled guilty to both charges, but reserved his right to appeal the denial of the suppression motion.
The Third District Court of Appeal affirmed the decision of the trial court. *181 Mackey, 83 So.3d at 943. The district court articulated the standard governing the legality of the Terry stop as follows:
When Officer May asked Mackey if he could conduct a pat-down search, the encounter remained a consensual one. However, when Mackey did not respond to this question and Officer May proceeded to conduct a pat-down search without Mackey’s consent, the encounter became an investigatory stop, for which Officer May needed reasonable suspicion. In addition, the pat-down search itself required Officer May to have probable cause to believe that Mackey was armed with a dangerous weapon.
Id. at 945-46 (emphasis supplied). The Third District rejected the rationale expressed in Regalado that where an officer has no information to indicate that an individual who the officer believes to be in possession of a firearm does not have a concealed weapons license, the officer lacks reasonable suspicion to detain that individual to further investigate whether the crime of carrying a concealed firearm is being committed. Id. at 945. According to the Third District:
Under Florida law, the crime of carrying a concealed firearm is complete upon proof that the defendant knowingly carried a firearm that was concealed from the ordinary sight of another person. The statutory provision which addresses the licensed carrying of a concealed firearm is contained in a subsection separate and distinct from the provision which prohibits the carrying of a concealed firearm. Thus, the absence of a license is not an element of the crime, but is considered an “exception” to the crime, and proof that a defendant possessed a license to carry a concealed firearm must be raised as an affirmative defense.
Mackey’s argument, and the holding in Regalado, taken to its logical conclusion, would require that a police officer not only have reasonable suspicion of criminal activity, but reasonable suspicion of the non-existence of an affirmative defense to the crime. We decline the invitation to adopt such a holding. ...
Id. at 946-47 (citations and footnotes omitted).
Although the Third District held that the trial court had properly denied the motion to suppress, the district court certified conflict with the decision in Regalado on the issue of whether an officer who believes that someone is carrying a concealed firearm, -without more, has reasonable suspicion to conduct a Terry stop. Id. at 944, 947. This review followed.
ANALYSIS
First, Florida’s legislative scheme causes us to hold that licensure is an affirmative defense to a charged crime of carrying a concealed weapon, as codified at section 790.01, Florida Statutes (2013),[5] and the lack of a license is not an element of the crime. This conclusion is based upon a clear reading of section 790.01 and consideration of its structure, the chapter of the Florida Statutes that governs firearms and other weapons, and the legal precedent on this issue. Notwithstanding this holding, we have determined that the role of licensure in the Florida legislative scheme is not dispositive of the resolution of the legality of the stop of Mackey. Instead, this matter can be addressed solely by reference to Fourth Amendment precedent from the United States Supreme Court and the totality of the circumstances presented by this case.
*182 Relevant Constitutional Provisions
The Fourth Amendment to the United States Constitution and article I, section 12, of the Florida Constitution guarantee citizens the right to be free from unreasonable searches and seizures. The Florida Constitution expressly provides that this right is to be construed in conformity with the Fourth Amendment, as interpreted by the United States Supreme Court. Art. I, § 12, Fla. Const. Items that are obtained in violation of the Florida Constitution will be excluded from evidence if those items are subject to exclusion under Fourth Amendment jurisprudence of the United States Supreme Court. Id.
At issue in this case is a Fourth Amendment investigatory detention which is commonly referred to as a Terry stop. It is not disputed that Mackey was subjected to a Terry stop; rather, at issue is whether the Terry stop that occurred was constitutionally valid. To resolve this question, we must consider the case that initially recognized the validity of a Terry stop and the standards that have been articulated in various cases by the United States Supreme Court to evaluate the validity of such stops.
The Terry Stop
In Terry v. Ohio, 392 U.S. 1, 5, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), a detective observed John Terry and codefendant Richard Chilton standing on a street corner. Each defendant alternately would walk down a sidewalk, pause to look in a store window, continue to walk further down the sidewalk, then turn around and walk back toward the other defendant, again pausing to look in the same store window. Id. at 6, 88 S.Ct. 1868. According to the detective, each defendant repeated this “walk” approximately six times, causing the defendants to walk the same path one dozen times and look into the same store window two dozen times. Id. Suspicious that the defendants were involved in criminal activities (that they were “casing a job, a stick-up”), the detective approached the defendants, identified himself as a police officer, and asked their names. Id. at 6-7, 88 S.Ct. 1868. After the men “mumbled something,” the detective spun defendant Terry around and patted down the outside of his clothing. Id. The detective detected a weapon and retrieved a gun from the pocket of Terry’s overcoat. Id. The detective also patted down (frisked) defendant Chilton and retrieved a gun from his overcoat as well. Id. The men were arrested and charged with carrying concealed weapons. Id.
The trial court denied the defendants’ joint motion to suppress the weapons, concluding that, although probable cause did not exist to arrest the defendants for a crime, the detective, based upon his experience, “had reasonable cause to believe ... that the defendants were conducting themselves suspiciously, and some interrogation should be made of their action.” Id. at 7-8, 88 S.Ct. 1868. The trial court held that the stop and frisk of the defendants was distinct from an arrest and a “full-blown” search for evidence of a crime. Id. at 8, 88 S.Ct. 1868. The trial court concluded that the frisk “was essential to the proper performance of the officer’s investigatory duties, for without it, the answer to the police officer may be a bullet, and a loaded pistol discovered during the frisk is admissible.” Id. The defendants were adjudged guilty, and their convictions were subsequently affirmed by an Ohio appellate court. Id.
On certiorari review, the United States Supreme Court affirmed Terry’s *183 conviction. Id.[6] The Supreme Court first concluded that the stop and frisk of Terry by the detective constituted a search and seizure for Fourth Amendment purposes. Id. at 19, 88 S.Ct. 1868. Nonetheless, the Court concluded that when an officer justifiably believes that the person whose suspicious behavior is being investigated is armed and presently dangerous, “it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm.” Id. at 24, 88 S.Ct. 1868. The Supreme Court ultimately held that:
where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others’ safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him.
Id. at 30, 88 S.Ct. 1868. The Court noted that, in evaluating the validity of a stop and frisk, “it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search ‘warrant a man of reasonable caution in the belief that the action taken was appropriate?” Id. at 21-22, 88 S.Ct. 1868 (emphasis supplied). Further, to justify an investigatory stop, the law enforcement officer must provide “specific and articulable facts,” as well as rational inferences that may be drawn from those facts, in support of the stop. Id. at 21, 88 S.Ct. 1868. Since the United States Supreme Court’s decision, the limited stop-and-frisk of a suspect has been referred to as a Terry stop. The Supreme Court has subsequently reiterated that the police may “make a, forcible stop of a person when the officer has reasonable,' articulable suspicion that the person has been, is, or is about to be engaged in criminal activity.” United States v. Place, 462 U.S. 696, 702, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983); see also Illinois v. Wardlow, 528 U.S. 119, 123, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000).
The United States Supreme Court has held that a determination of whether a reasonable, articulable suspicion exists to create a circumstance for the police to lawfully conduct a Terry stop is based upon the totality of the circumstances. U.S. v. Sokolow, 490 U.S. 1, 8, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989). Further, & determination of reasonable, articulable suspicion is to be based on “commonsense judgments and inferences about human behavior.” Wardlow, 528 U.S. at 125, 120 S.Ct. 673. Factors that may be considered in evaluating whether a reasonable; articulable suspicion exists are the area in which the encounter occurred and whether the person observed engaged in nervous, evasive conduct, such as fleeing from the police. Id. at 124, 120 S.Ct. 673 (“An individual’s presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime.... But officers *184 are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation”). Moreover, although not binding precedent, one' federal appellate court has noted that “lies, evasions or inconsistencies about any subject while being detained” may contribute to a reasonable, articulable suspicion. U.S. v. Simpson, 609 F.3d 1140, 1149 (10th Cir.2010).
Application to This Case
We conclude that under the totality of the circumstances, Officer May had a reasonable, articulable suspicion to believe that Mackey was engaged in illegal activity. Further, because Officer. May knew that Mackey was in possession of a firearm, the stop and frisk pursuant to Terry was constitutionally valid.[7]
The record reflects that on the day in question, Officer May was patrolling in an area of Miami that is known for narcotics and firearms. Officer May explained that when he patrols, he observes hand gestures, waistbands, and pockets, “especially in that area.” It was in that geographic location that he observed Mackey with a firearm in his pocket. Officer May stopped his vehicle and approached Mackey to speak with him. Office May explained that he did not draw his service weapon because he- could observe Mackey’s hands. No suspicion of illegal activity was necessary at this stage of the encounter because the United States Supreme Court has explained that “a seizure does not occur simply because a police officer approaches an individual and asks a few questions. So long as a reasonable person would feel free ‘to disregard the police and go about his business,’ California v. Hodari D., 499 U.S. 621, 628, 111 S.Ct. 1547, 113 L.Ed.2d 690, (1991), the encounter is consensual and no reasonable suspicion is required.” Florida v. Bostick, 501 U.S. 429, 434, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991).
However, when Officer May began to speak with Mackey, the nature of the encounter changed. When Officer May asked “if [Mackey] had anything on him,” Mackey responded in the negative. Officer May’s observations had already identified a firearm in Mackey’s pocket and, therefore, he knew that Mackey was lying. When the person blatantly lied to the police officer here about possession of a firearm while he was in a geographic area well known for illegal narcotics and firearms with the weapon in view, we conclude that the officer had á reasonable, articulable suspicion that the person may have been engaged in illegal activity, and this brief detention to further investigate whether a crime was being committed is constitutionally valid. Further, if a police officer suspects that an armed individual is engaged in illegal activity, it is entirely reasonable for the officer to have concerns for his personal safety and the safety of those around him. See Terry, 392 U.S. at 23, 88 S.Ct. 1868 (“Certainly it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties. American criminals have a *185 long tradition of armed violence, and every year in this country many law enforcement officers are killed in the line of duty, and thousands more are wounded.”). Under such circumstances, the officer is entitled to “conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him.” Id. at 30, 88 S.Ct. 1868. Indeed, here, Officer May specifically stated that he removed the firearm from Mackey for safety reasons.
Under the objective standard of review, and under the totality of the circumstances presented by this case, we conclude that Officer May acted as a person of “reasonable caution” and within the acceptable parameters of the Fourth Amendment when he detained Mackey and conducted a protective frisk to remove the weapon that he knew Mackey possessed. Id. at 21-22, 88 S.Ct. 1868. Accordingly, we hold that the trial court properly denied Mackey’s motion to suppress, albeit for different reasons than those articulated by the Third District below.
The Conflict Case
Based on the prior analysis, we conclude that the decision in Regalado is factually distinguishable from the decision below. Here, Officer May initially approached Mackey in a non-threatening manner and participated in a consensual encounter. It was Mackey’s response to a question asked by Officer May during the consensual encounter that led Officer May to reasonably and articulably suspect that Mackey might be engaged in illegal activity. On the other hand, in Regalado, the officer stopped the defendant at gunpoint and ordered him to the ground solely on the basis that the officer believed the defendant was carrying a firearm in the waistband of his pants. Regalado, 25 So.3d at 601-02. The officer did not ask the defendant any questions, and the Fourth District Court of Appeal specifically noted that “no information of suspicious criminal activity was provided to the officer other than appellant’s possession of a gun.” Id. at 601. Given the differing factual circumstances that preceded the two different stops at issue, we conclude that even though the decisions appear to be in conflict, the cases can be reconciled, and no actual conflict exists.
CONCLUSION
In light of the foregoing, we approve the holding — but not the reasoning — of the Third District Court of Appeal that the Terry stop of Mackey was valid under the United States and Florida Constitutions. We further approve the conclusion of the Third District that licensure is an affirmative defense to the crime of carrying a concealed weapon. See § 790.01, Fla. Stat. (2013). The case is remanded for further proceedings consistent with this opinion.
It is so ordered.
POLSTON, C.J., and PARIENTE, QUINCE, LABARGA, and PERRY, JJ., concur.
CANADY, J., concurs in result.

. The record is not clear as to how, or whether, Mackey responded to this request.

. Officer May stated during his deposition that "if it's a firearm on a person, we have to retrieve it, just for our safety." (Emphasis supplied.)

.Mackey had been previously convicted of the sale, delivery, or possession with intent to sell or deliver cocaine on school grounds or within 1,000 feet of a school.

. See Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

. The statute has not been amended since Mackey was arrested in 2010.

. Although Terry and Chilton filed a joint petition for writ of certiorari, Chilton died after the United States Supreme Court granted certiorari review. For this reason, the Supreme Court only reviewed the conviction of Terry. 392 U.S. at 5 n. 2, 88 S.Ct. 1868.

. Contrary to the decision below, Officer May did not need probable cause to frisk Mackey. Mackey, 83 So.3d at 946 ("[T]he pat-down search itself required Officer May to have probable cause to believe that Mackey was armed with a dangerous weapon.”). Only reasonable, articulable suspicion is required before an officer may conduct a protective frisk pursuant to the decision of the United States Supreme Court in Terry. Therefore, although we approve the holding of the Third District with regard to the validity of the Terry stop, we disapprove this statement as to what is required before a law enforcement officer may conduct a pat-down search for weapons.