DISTRICT COURT OF APPEAL OF FLORIDA
SECOND DISTRICT

_____

MARQUIS DE'QUAN CARTER,

Appellant,

v.

STATE OF FLORIDA,

Appellee.

No. 2D2022-3275

_____

June 21, 2024

Appeal from the Circuit Court for Hillsborough County; Mark D. Kiser, Judge.

Howard L. Dimmig, II, Public Defender, and Daniel Muller, Assistant Public Defender, Bartow, for Appellant.

Ashley Moody, Attorney General, Tallahassee, and James A. Hellickson, Assistant Attorney General, Tampa, for Appellee.

KHOUZAM, Judge.

Marquis De'Quan Carter timely appeals the judgment and sentences entered against him for one count of possessing a firearm as a felon and one count of carrying a concealed firearm without a permit. After his motion to suppress was denied, Mr. Carter entered a best-interest guilty plea, expressly reserving the right to appeal the ruling.

On appeal, Mr. Carter contends that the trial court should have granted the motion to suppress on the basis that the charges resulted from a *Terry*[1] stop for which law enforcement lacked a reasonable suspicion of criminal activity to seize him. We agree, reverse the judgment and sentences, and remand for Mr. Carter's discharge.

## BACKGROUND

The following undisputed facts are taken from the testimony and body camera video evidence at the suppression hearing.

In October 2021, in full daylight, several officers were undercover surveilling an apartment complex located in a high crime area. Officer Anton Lipski saw Mr. Carter walking within the complex. Officer Lipski observed a black clip extending vertically down from Mr. Carter's waist, which he recognized to be an inside-the-waist firearm holster.

Upon seeing the holster, Officer Lipski requested additional units from his squad. Officer Lipski testified that he gave a description of Mr. Carter over the radio and "explained that I thought that I had a subject that was armed with a pistol on the center of his waist."

Other officers responded to Officer Lipski's call, saying they had spotted Mr. Carter walking near the complex's dumpster. Officer Lipski coordinated with Officer Ryan Barreira to approach Mr. Carter simultaneously. In preparation for making contact, Officer Lipski put on his marked ballistic vest and got out of his unmarked car.

Officer Lipski went to the dumpster area and saw Mr. Carter walking with another man. Officer Lipski followed them and made his first contact with Mr. Carter, asking from about twenty-five feet behind him either "Do you have a permit for that gun?" or "Do you have a permit?" Mr. Carter looked back and saw Officer Lipski but did not

---

[1] *Terry v. Ohio*, 392 U.S. 1 (1968).

respond. Instead, Mr. Carter simply "continued on the path that he was initially walking." The other man walking with Mr. Carter also looked back and ignored Officer Lipski, who continued to follow them.

At that point, Officer Barreira arrived. He testified that he did so in response to Officer Lipski's observation that "he saw a subject with a black shirt on, gray shorts and what he observed to be a clip over the waistband of that individual, and he believed it to be the clip of a inside-the-waistband or concealed carry holster designed to carry a pistol."

Officer Barreira came from around a corner and approached Mr. Carter from the front. Officer Barreira immediately commanded Mr. Carter to move his hands away from his waist. Mr. Carter immediately complied and stopped walking. Officer Lipski continued to ask Mr. Carter whether he had a permit for the handgun. At that point, Mr. Carter admitted that he did not, and the officers handcuffed him.

There is no suggestion that Mr. Carter took any affirmative acts other than appearing to possess a handgun in a concealed holster while walking casually through an apartment complex. Officers expressly denied seeing Mr. Carter running, being loud or causing a disturbance, pulling the gun out, threatening anyone, making furtive movements, or engaging in any suspicious transactions. Indeed, when later pressed at the suppression hearing about what Mr. Carter had done wrong, Officer Barreira declined to identify anything "[b]esides having a firearm."

After being charged, Mr. Carter moved to suppress both the physical evidence from the arrest and his admission to not possessing a permit. Mr. Carter argued the officers lacked even a reasonable suspicion of criminal activity necessary for a *Terry* stop. Specifically, he contended that neither carrying a concealed weapon nor ignoring the officer's questions were sufficient to permit involuntary detention. Thus,

3

when Officer Barreira approached Mr. Carter and commanded him to keep his hands away from his waist, Mr. Carter was improperly seized.

Notably, at the suppression hearing, the State conceded that Mr. Carter was seized when Officer Barreira approached and commanded him to keep his hands away from his waist. It is undisputed that this command occurred before Mr. Carter made any admissions. Even so, the State contended that the officers had a reasonable suspicion to seize Mr. Carter to conduct a *Terry* stop because he had possessed a concealed handgun in a high crime area and had ignored Officer Lipski's questions.

Ultimately, the trial court denied the motion to suppress, expressly ruling that the officers had reasonable suspicion to stop Mr. Carter based on the following three facts: (1) the officers saw what they believed to be a concealed firearm in Mr. Carter's waistband, (2) Mr. Carter was in a high crime area, and (3) Mr. Carter declined to answer Officer Lipski's question about whether or not he possessed a permit for the gun.

## ANALYSIS

Mr. Carter contends that the trial court erred in finding that the officers had a reasonable suspicion of criminal activity sufficient to detain him. Specifically, he asserts that none of the three factors relied upon by the trial court are sufficient, either individually or together, to pass constitutional muster. If the trial court was correct, he maintains, then any person carrying a concealed firearm in an area considered to be high in crime subjects themselves to a *Terry* stop if they fail to respond to officer questions about it. As we now explain, we agree with Mr. Carter.

Governing Authorities

A trial court's ruling on a motion to suppress is presumed correct, and the reviewing court interprets the evidence and reasonable inferences in the manner most favorable to sustaining it. *See, e.g.,*

4

*Connor v. State*, 803 So. 2d 598, 605 (Fla. 2001). Even so, the determination of reasonable suspicion is reviewed de novo. *Id.* (citing *Ornelas v. United States*, 517 U.S. 690, 699 (1996)). Thus, this court applies "a two-step approach, deferring to the trial court on questions of historical fact but conducting a de novo review of the constitutional issue." *Id.*

"To warrant an investigatory stop, the law requires not just a mere suspicion of criminal activity, but a reasonable, well-founded one." *State v. Teamer*, 151 So. 3d 421, 426 (Fla. 2014) (citing *Popple v. State*, 626 So. 2d 185, 186 (Fla. 1993)). Whether such a reasonable suspicion existed is based on the totality of the circumstances, from the standpoint of an objectively reasonable officer. *Id.* (collecting cases).

While this question generally focuses on potentially criminal acts, "several incidents of innocent activity [can] combin[e] under a totality of the circumstances to arouse a reasonable suspicion." *Id.* at 427 (citing *Terry v. Ohio*, 392 U.S. 1 (1968)); *see also Illinois v. Wardlow*, 528 U.S. 119, 125 (2000) ("Even in *Terry*, the conduct justifying the stop was ambiguous and susceptible of an innocent explanation"). But "the suspicion still must be a reasonable one," based on facts " 'inherently suspicious' or 'unusual' enough or so 'out of the ordinary' as to provide an officer with a reasonable suspicion of criminal activity." *Teamer*, 151 So. 3d at 427-28 (quoting *State v. Johnson*, 561 So. 2d 1139, 1142-43 (Fla. 1990)); *see also Wardlow*, 528 U.S. at 123 ("[T]he Fourth Amendment requires at least a minimal level of objective justification for making the stop.").

Several Florida and federal[2] authorities discuss the three discrete factors the trial court relied upon and thereby guide this court's analysis.

With respect to concealed handguns, "carrying a concealed firearm is not sufficient, without more, to justify a *Terry* stop." *Burnett v. State*, 246 So. 3d 516, 518 (Fla. 5th DCA 2018) (citing *Slydell v. State*, 240 So. 3d 134 (Fla. 2d DCA 2018); *Regalado v. State*, 25 So. 3d 600 (Fla. 4th DCA 2009)); *see also Kilburn v. State*, 297 So. 3d 671, 675 (Fla. 1st DCA 2020) ("[A] law enforcement officer may not use the presence of a concealed weapon as the sole basis for seizing an individual."); *Taylor v. State*, 326 So. 3d 115, 119 (Fla. 1st DCA 2021) (following *Kilburn*).

Likewise with respect to areas considered high in crime, "[a]n individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime." *Wardlow*, 528 U.S. at 124; *see also McMaster v. State*, 780 So. 2d 1026, 1029 (Fla. 5th DCA 2001) (explaining that under *Wardlow* "it is well settled that an individual's presence in a high crime area alone is not sufficient to establish a reasonable suspicion on the part of law enforcement officers to conduct an investigatory stop of that individual"). However, "the fact that the stop occurred in a 'high crime area' [is] among the relevant contextual considerations in a *Terry* analysis." *Wardlow*, 528 U.S. at 124.

In the absence of a reasonable suspicion of criminal activity or probable cause to arrest, an individual asked questions by an officer "has

---

[2] Our constitution provides that its protection against searches and seizures "shall be construed in conformity with the 4th Amendment to the United States Constitution, as interpreted by the United States Supreme Court." Art. I, § 12, Fla. Const. Thus, Florida courts "are bound to follow the interpretations of the United States Supreme Court with relation to the fourth amendment." *Bernie v. State*, 524 So. 2d 988, 990-91 (Fla. 1988).

a right to ignore the police and go about his business." *Fields v. State*, 292 So. 3d 889, 895 (Fla. 2d DCA 2020) (quoting *T.P. v. State*, 224 So. 3d 792, 794 (Fla. 2d DCA 2017)); *see also Caldwell v. State*, 41 So. 3d 188, 195 (Fla. 2010) ("During a consensual encounter, an individual is free to leave at any time and may choose to ignore the officer's requests and go about his business." (citing *Popple*, 626 So. 2d at 186)).

This right exists even in "high crime" areas. *See Fields*, 292 So. 3d at 894-95 (reversing convictions and concluding that trial court should have granted suppression despite defendant's unwillingness to answer police questions or obey commands in a high crime area where no grounds to detain existed in the first place). In some circumstances, it withstands even outright flight in "high crime" areas. *See Wardlow*, 528 U.S. at 139 (Stevens, J., concurring in part and dissenting in part) ("[E]ven in a high crime neighborhood unprovoked flight does not invariably lead to reasonable suspicion."); *see also Rhoden v. State*, 941 So. 2d 5, 9-10 (Fla. 2d DCA 2006) (distinguishing *Wardlow*, reversing convictions, and concluding that trial court should have granted suppression "[b]ecause the officers did not have the reasonable suspicion necessary to authorize an investigatory stop after Rhoden's provoked flight" in high crime area).

Crucially, refusal to consent cannot validly be considered in determining reasonable suspicion. As the Tenth Circuit has explained:

> [W]e emphasize that refusal to consent should not have been considered in determining reasonable suspicion. Any other rule would make a mockery of the reasonable suspicion and probable cause requirements, as well as the consent doctrine. These legal principles would be considerably less effective if citizens' insistence that searches and seizures be conducted in conformity with constitutional norms could create the suspicion or cause that renders their consent unnecessary.

7

*United States v. Hunnicutt,* 135 F.3d 1345, 1350-51 (10th Cir. 1998) (citations omitted) (collecting United States Supreme Court cases).

This Case

Here, as the above authorities reflect, each factor the trial court expressly relied upon has repeatedly been determined to be insufficient to support a reasonable suspicion of criminal activity that would permit officers to detain an individual. Neither possession of a concealed firearm nor presence in a high crime area nor ignoring officer inquiries are sufficient, standing alone, to establish a reasonable suspicion.

The question thus becomes whether these three factors, taken together, are sufficient to permit law enforcement to conduct a *Terry* stop. In particular, it is whether, once an officer sees a person appearing to possess a concealed firearm in a high crime area and asks that person about it, a refusal to respond grants the officer a reasonable articulable suspicion of criminal activity sufficient under the Florida and federal constitutions to permit the officer to involuntarily detain the person.

On that point, Mr. Carter's brief persuasively argues:

> If law enforcement could use your refusal to answer their questions as a means to get the ball over the line for a reasonable suspicion determination, then what choice do you really have but to answer their questions? No reasonable person would decline to answer their questions if they knew that refusing to do so could arouse suspicion that would subject them to a *Terry* stop. And if no reasonable person would feel free to decline to answer, then aren't they actually seized at the very moment the officer asks the question?

We agree with Mr. Carter's assessment. We emphasize that the testifying officers here expressly denied seeing Mr. Carter do anything suspicious "[b]esides having a firearm." The mere additional facts that he did so in an area considered to be high in crime and that he declined

8

to answer officer questions yelled from twenty-five feet behind him did not operate to transform the officers' suspicion into a reasonable one.

In denying relief, the trial court relied on *Mackey v. State*, 124 So. 3d 176 (Fla. 2013), which also involved firearm possession in a high crime area. But that case is materially distinguishable, as the defendant there "blatantly lied to the police officer . . . about possession of a firearm . . . with the weapon in view." *Id.* at 184. By contrast, Mr. Carter made no predetention statements at all, much less an obvious lie.

Finally, in a section of its brief titled "Changes in the Law," the State explains that "recently Florida changed its law about permitted firearms," citing specifically to a 2023 legislative amendment to section 790.06, Florida Statutes, and the resulting current 2024 text. *See* ch. 2023-18, § 10, Laws of Fla. Expressly citing only its "current version," the State contends that "the amended statute" supports affirmance.

We are puzzled by this argument, as the State nowhere attempts to explain how this 2023 legislation might apply to Mr. Carter's 2021 arrest. *See, e.g.*, *State v. Crose*, 378 So. 3d 1217, 1239 (Fla. 2d DCA 2024) (en banc) ("Both the federal and state constitutions generally forbid the ex post facto application of criminal laws."). Nor, by expressly invoking only the 2023 amendment, does the State cite to or ask us to apply any statutes that were actually in effect in 2021. We thus need not, and do not, reach the issue of how section 790.06 might apply in this case.

Because the undisputed facts establish that law enforcement lacked a reasonable suspicion of criminal activity, the trial court should have granted Mr. Carter's motion to suppress the evidence obtained during his unlawful detention. We accordingly reverse his judgment and sentences and remand for discharge. *See Teamer*, 151 So. 3d at 431 (approving decision "reversing the . . . judgment and sentence and

9

ordering that [the defendant] be discharged" upon concluding that trial court should have granted motion to suppress improper investigatory stop); *Fields*, 292 So. 3d at 896 (reversing and remanding for discharge in the absence of reasonable suspicion for investigatory detention).

Reversed and remanded with instructions.

SLEET, C.J., and VILLANTI, J., Concur.

————————————

Opinion subject to revision prior to official publication.