# Supreme Court of Florida

_____

No. SC13-318
_____

**STATE OF FLORIDA,**
Petitioner,

vs.

**KERRICK VAN TEAMER,**
Respondent.

[July 3, 2014]

QUINCE, J.

This case is before the Court for review of the decision of the First District

Court of Appeal in Teamer v. State, 108 So. 3d 664 (Fla. 1st DCA 2013).[1]  The

district court certified that its decision is in direct conflict with the decision of the

Fourth District Court of Appeal in Aders v. State, 67 So. 3d 368 (Fla. 4th DCA

2011).  We have jurisdiction.  See art. V, § 3(b)(4), Fla. Const.  As we explain, we

approve the First District's decision and disapprove that of the Fourth District.

## FACTS AND PROCEDURAL HISTORY

_____

1. The record presents some confusion regarding the Respondent's surname.
Although his full name is "Kerrick Van Teamer," his surname is "Teamer," not
"Van Teamer."  This opinion refers to him and his case below accordingly.

On June 22, 2010, an Escambia County Deputy Sheriff observed Kerrick Teamer driving a bright green Chevrolet.  Teamer, 108 So. 3d at 665.  After noticing the car, the deputy continued on his patrol, driving into one of the neighborhoods in that area.  Upon traveling back to where he had first seen Teamer, the deputy again observed Teamer driving the same car.  The deputy then "ran" the number from Teamer's license plate through the Florida Department of Highway Safety and Motor Vehicles (DHSMV) database, as is customary for him while on patrol, and learned that the vehicle was registered as a blue Chevrolet.  Id. The database did not return any information regarding the model of the vehicle. Based only on the color inconsistency, the deputy pulled the car over to conduct a traffic stop.

"Upon interviewing the occupants, the deputy learned that the vehicle had recently been painted, thus explaining the inconsistency."  Id.  However, during the stop, the deputy noticed a strong odor of marijuana emanating from the car and decided to conduct a search of the vehicle, Teamer, and the other passenger.  Id. "Marijuana and crack cocaine were recovered from the vehicle, and about $1,100 in cash was recovered from [Teamer].  [He] was charged with trafficking in cocaine (between 28–200 grams), possession of marijuana (less than 20 grams), and possession of drug paraphernalia" (scales).  Id.

On October 4, 2010, Teamer filed a motion to suppress the results of the stop as products of an unlawful, warrantless search. At the hearing on the motion to suppress, the deputy acknowledged that, in his training and experience, he had encountered individuals who would switch license plates and he could not verify a vehicle's identification number without pulling over the vehicle. Id. On cross-examination, the deputy acknowledged that the car was not reported stolen, he had not observed any other traffic violations or suspicious or furtive behavior, he was not "aware of any reports of stolen vehicles or swapped plates in the area," and "the only thing that was out of the ordinary was the inconsistency of the vehicle color from the registration." Id.

The trial court denied the motion to suppress, explaining that the rationale for the denial was that the deputy "had a legal right to conduct an investigatory stop when a registration search of the automobile license tag reflected a different color than the observed color of the vehicle." The trial court found that the deputy made the investigatory stop "because the registration was not consistent with the color of the vehicle" and that since "the vehicle was legally stopped for investigative purposes," the odor of marijuana that the officer smelled during the stop gave him probable cause to conduct a search. After a jury trial, Teamer was convicted on all three counts as charged in the information. The trial judge sentenced him to six years on count one and time served on the other two counts.

Teamer appealed, and the First District reversed the trial court's denial of Teamer's motion to suppress, certifying conflict with the Fourth District in Aders. Id. at 670. The First District acknowledged "that any discrepancy between a vehicle's plates and the registration may legitimately raise a concern that the vehicle is stolen or the plates were swapped from another vehicle," but found that such concern must be weighed "against a citizen's right under the Fourth Amendment to travel on the roads free from governmental intrusions." Id. at 667. The district court cited several cases demonstrating that color discrepancy is typically one of several factors constituting reasonable suspicion. Id. at 668. The First District then cited two nonbinding cases[2] for the principle that a color discrepancy alone does not provide reasonable suspicion for a stop. Id. at 668-69. Relying on those cases and other "somewhat analogous cases involving investigations of 'temporary tags,' " the district court ruled that a color discrepancy alone did not warrant an investigatory stop. Id. at 669-70. The court found that under the converse ruling, "every person who changes the color of [his or her] vehicle is continually subject to an investigatory stop so long as the color inconsistency persists." Id. at 670. The First District stated that it was "hesitant to license an investigatory stop" under such circumstances. Id.

_____

2. United States v. Uribe, No. 2:10-cr-17-JMS-CMM, 2011 WL 4538407 (S.D. Ind. Sept. 28, 2011); Commonwealth v. Mason, 78 Va. Cir. 474 (Cir. Ct. 2009), aff'd, No. 1956-09-2, 2010 WL 768721 (Va. Ct. App. Mar. 9, 2010).

## ANALYSIS

In reviewing a trial court's ruling on a motion to suppress, the trial court's determinations of historical facts are reversed only if not supported by competent, substantial evidence. Connor v. State, 803 So. 2d 598, 608 (Fla. 2001). However, the application of the law to those facts is subject to de novo review. Id. Further, this Court is required to construe Florida's constitutional right against unreasonable searches and seizures "in conformity with the [Fourth] Amendment to the United States Constitution, as interpreted by the United States Supreme Court." Art. I, § 12, Fla. Const.; Bernie v. State, 524 So. 2d 988, 990-91 (Fla. 1988) ("[W]e are bound to follow the interpretations of the United States Supreme Court with relation to the [F]ourth [A]mendment . . . .").

The United States Supreme Court has "held that the police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause." United States v. Sokolow, 490 U.S. 1, 7 (1989) (quoting Terry v. Ohio, 392 U.S. 1, 30 (1968)); Popple v. State, 626 So. 2d 185, 186 (Fla. 1993) ("[A] police officer may reasonably detain a citizen temporarily if the officer has a reasonable suspicion that a person has committed, is committing, or is about to commit a crime." (citing § 901.151, Fla. Stat. (1991))). However, a "police officer must be able to point to specific and articulable facts

which, taken together with rational inferences from those facts, reasonably warrant" an investigatory stop. Terry, 392 U.S. at 21. The Supreme Court has described reasonable suspicion as "a particularized and objective basis for suspecting the particular person stopped of criminal activity." United States v. Cortez, 449 U.S. 411, 417 (1981). This standard requires "something more than an 'inchoate and unparticularized suspicion or hunch.' " Sokolow, 490 U.S. at 7 (quoting Terry, 392 U.S. at 27) (internal quotation marks omitted).

"Reasonableness, of course, depends 'on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers.' " Pennsylvania v. Mimms, 434 U.S. 106, 109 (1977) (quoting United States v. Brignoni-Ponce, 422 U.S. 873, 878 (1975)); State v. Diaz, 850 So. 2d 435, 439 (Fla. 2003) ("The real test is one of reasonableness, which involves balancing the interests of the State with those of the motorist."). "When a search or seizure is conducted without a warrant, the government bears the burden of demonstrating that the search or seizure was reasonable." Hilton v. State, 961 So. 2d 284, 296 (Fla. 2007) (citing United States v. Johnson, 63 F.3d 242, 245 (3d Cir. 1995) ("As a general rule, the burden of proof is on the defendant who seeks to suppress evidence. However, once the defendant has established a basis for his motion, i.e., the search or seizure was conducted without a warrant,

the burden shifts to the government to show that the search or seizure was reasonable." (citation omitted))).

Reasonable suspicion must also be assessed based on "the totality of the circumstances—the whole picture," Cortez, 449 U.S. at 417; United States v. Arvizu, 534 U.S. 266, 277 (2002), and "from the standpoint of an objectively reasonable police officer," Ornelas v. United States, 517 U.S. 690, 696 (1996); Arvizu, 534 U.S. at 277. Thus, a police officer may draw inferences based on his own experience. Ornelas, 517 U.S. at 700; Cortez, 449 U.S. at 418 ("[A] trained officer draws inferences and makes deductions—inferences and deductions that might well elude an untrained person."). However, "the officer's subjective intentions are not involved in the determination of reasonableness." Hilton, 961 So. 2d at 294; Whren v. United States, 517 U.S. 806, 813 (1996) (recognizing the rejection of "any argument that the constitutional reasonableness of traffic stops depends on the actual motivations of the individual officers involved").

"[I]nnocent behavior will frequently provide the basis" for reasonable suspicion. Sokolow, 490 U.S. at 10; see also Illinois v. Wardlow, 528 U.S. 119, 125 (2000) (acknowledging this fact and recognizing that an officer can detain an individual to resolve an ambiguity regarding suspicious yet lawful or innocent conduct). "[T]he relevant inquiry is not whether particular conduct is innocent or guilty, but the degree of suspicion that attaches to particular types of noncriminal

acts." Sokolow, 490 U.S. at 10 (internal quotation marks omitted). In the instant case, the State concedes that "the failure to update a vehicle registration to reflect a new color is not in specific violation of a Florida law." Thus, what degree of suspicion attaches to this noncriminal act?

To warrant an investigatory stop, the law requires not just a mere suspicion of criminal activity, but a reasonable, well-founded one. Popple, 626 So. 2d at 186 ("[A]n investigatory stop requires a well-founded, articulable suspicion of criminal activity."). In Terry, the stop was found appropriate because the officer "had observed [three men] go [t]hrough a series of acts, each of them perhaps innocent in itself, but which taken together warranted further investigation." Terry, 392 U.S. at 22. The U.S. Supreme Court described the scenario as follows:

> There is nothing unusual in two men standing together on a street corner, perhaps waiting for someone. Nor is there anything suspicious about people in such circumstances strolling up and down the street, singly or in pairs. Store windows, moreover, are made to be looked in. But the story is quite different where, as here, two men hover about a street corner for an extended period of time, at the end of which it becomes apparent that they are not waiting for anyone or anything; where these men pace alternately along an identical route, pausing to stare in the same store window roughly 24 times; where each completion of this route is followed immediately by a conference between the two men on the corner; where they are joined in one of these conferences by a third man who leaves swiftly; and where the two men finally follow the third and rejoin him a couple of blocks away.

Id. at 22-23. The Supreme Court found that "[i]t would have been poor police work indeed for an officer of 30 years' experience in the detection of thievery from

- 8 -

stores in this same neighborhood to have failed to investigate this behavior further." Id. at 23. Thus each seemingly innocent activity in Terry had a cumulative effect of providing an officer with a reasonable suspicion.

Conversely, in State v. Johnson, 561 So. 2d 1139, 1142 (Fla. 1990), this Court rejected an officer's use of a self-created drug courier profile because "Florida law does not permit a profile based on factors that are little more than mundane or unremarkable descriptions of everyday law-abiding activities." We noted that a drug courier profile in a Supreme Court case[3] was upheld "precisely because it described unusual conduct that set the defendant apart from other travelers and that strongly suggested concealed criminal conduct." Id. We invalidated the profile used in Johnson because "there was nothing at all unusual or out of the ordinary about the conduct that" fit within the profile. Id. at 1142-43. In so holding, we stated that individuals fitting within the officer's profile "simply cannot be described as an inherently 'suspicious' bunch." Id. at 1143. The innocent factors within the profile failed to create a reasonable suspicion.

Turning to the instant case, the sole basis here for the investigatory stop is an observation of one completely noncriminal factor, not several incidents of innocent activity combining under a totality of the circumstances to arouse a reasonable suspicion—as was the case in Terry. The discrepancy between the vehicle

---

3. Sokolow, 490 U.S. 1.

registration and the color the deputy observed does present an ambiguous situation, and the Supreme Court has recognized that an officer can detain an individual to resolve an ambiguity regarding suspicious yet lawful or innocent conduct. Wardlow, 528 U.S. at 125. However, the suspicion still must be a reasonable one. Popple, 626 So. 2d at 186 ("Mere suspicion is not enough to support a stop."). In this case, there simply are not enough facts to demonstrate reasonableness. Like the factors in Johnson, the color discrepancy here is not "inherently suspicious" or "unusual" enough or so "out of the ordinary" as to provide an officer with a reasonable suspicion of criminal activity, especially given the fact that it is not against the law in Florida to change the color of your vehicle without notifying the DHSMV.

The law allows officers to draw rational inferences, but to find reasonable suspicion based on this single noncriminal factor would be to license investigatory stops on nothing more than an officer's hunch. Doing so would be akin to finding reasonable suspicion for an officer to stop an individual for walking in a sparsely occupied area after midnight simply because that officer testified that, in his experience, people who walk in such areas after midnight tend to commit robberies. Without more, this one fact may provide a "mere suspicion," but it does

not rise to the level of a reasonable suspicion.[4]  Neither does the sole innocent factor here—a color discrepancy—rise to such level.  The deputy may have had a suspicion, but it was not a reasonable or well-founded one, especially given the fact that the driver of the vehicle was not engaged in any suspicious activity.  Moreover, "the government provided no evidence to tip the scales from a mere hunch to something even approaching reasonable and articulable suspicion, despite attempting to justify a detention based on one observed incident of completely innocent behavior in a non-suspicious context."  United States v. Uribe, 709 F.3d 646, 652 (7th Cir. 2013).

Reasonableness also "depends 'on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers.' "  Mimms, 434 U.S. at 109 (quoting Brignoni-Ponce, 422 U.S. at 878); Diaz, 850 So. 2d at 439 ("The real test is one of reasonableness, which involves balancing the interests of the State with those of the motorist.").  In order to determine reasonableness, courts "must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion."  United States v. Place, 462 U.S. 696, 703 (1983); Delaware v. Prouse, 440 U.S. 648, 654 (1979) ("[T]he

---

4.  The State conceded as much during oral argument in this case.  When asked whether that scenario provided enough reasonable suspicion for a stop, the prosecutor responded, "It would depend on what else they were doing . . . ."

permissibility of a particular law enforcement practice is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests."). Thus we must balance the nature and quality of the intrusion required to stop an individual and investigate a color discrepancy against the government's interest in finding stolen vehicles or enforcing vehicle registration laws.[5]

In Brignoni-Ponce, the Supreme Court invalidated a roving patrol stop by Border Patrol agents near a closed checkpoint operation at the Mexican border. 422 U.S. at 886. In stopping the vehicle, the agents had relied on a single factor— "the apparent Mexican ancestry of the occupants." Id. at 885-86. As part of balancing the public interest with the motorist's rights, the Supreme Court outlined as the governmental interest preventing illegal aliens from entering this country. Id. at 878-80. However, despite the importance of that interest, the "modest" intrusion of a brief stop, and the absence of practical alternatives for policing the border, the Court found that the apparent Mexican heritage of the occupants did not provide reasonable suspicion for a stop. Id. at 881, 886. The Court stated,

_____

5. See § 320.02(6), Fla. Stat. (2010) ("Any person who registers his or her motor vehicle by means of false or fraudulent representations made in any application for registration is guilty of a misdemeanor of the second degree . . . ."); § 320.261 (making it illegal to "knowingly attach[] to any motor vehicle" a license plate that was not "lawfully transferred to such vehicle"); § 320.0609(2)(a) (making it unlawful to transfer license plates to a different vehicle without notifying DHSMV).

"The likelihood that any given person of Mexican ancestry is an alien is high enough to make Mexican appearance a relevant factor, but standing alone it does not justify stopping all Mexican-Americans to ask if they are aliens." Id. at 886-87; cf. United States v. Martinez-Fuerte, 428 U.S. 543, 545, 557-59 (1976) (upholding stops for brief questioning at fixed checkpoints even with no reasonable suspicion of illegal aliens because although the need for such stops is as great as that in Brignoni-Ponce, a checkpoint stop is much less intrusive since "the generating of concern or even fright on the part of lawful travelers is appreciably less").

Similarly, in Prouse, the Supreme Court invalidated a random vehicle stop by roving patrol officers solely to confirm a driver's compliance with licensure and registration requirements. 440 U.S. at 659. The Court described the intrusion on the motorist's interests as follows:

> We cannot assume that the physical and psychological intrusion visited upon the occupants of a vehicle by a random stop to check documents is of any less moment than that occasioned by a stop by border agents on roving patrol. Both of these stops generally entail law enforcement officers signaling a moving automobile to pull over to the side of the roadway, by means of a possibly unsettling show of authority. Both interfere with freedom of movement, are inconvenient, and consume time. Both may create substantial anxiety. For Fourth Amendment purposes, we also see insufficient resemblance between sporadic and random stops of individual vehicles making their way through city traffic and those stops occasioned by roadblocks where all vehicles are brought to a halt or to a near halt, and all are subjected to a show of the police power of the community. At traffic checkpoints the motorist can see that other

- 13 -

> vehicles are being stopped, he can see visible signs of the officers' authority, and he is much less likely to be frightened or annoyed by the intrusion.

Id. at 657 (internal quotation marks omitted). The Court balanced that intrusion with the state's interests in apprehending stolen vehicles—which the Court characterized as indistinguishable from a "general interest in crime control"—and promoting roadway safety. Id. at 658-59 & n.18. The Supreme Court held that given the alternative mechanisms available for enforcing traffic and vehicle safety regulations—the foremost of which being to act only upon observed violations— the incremental contribution to highway safety of the random stops in that case did not justify their intrusion on Fourth Amendment rights. Id. at 659.

The intrusion involved in the instant case is similar to that described in Prouse, especially considering that anyone who chooses to paint his or her vehicle a different color could be pulled over by law enforcement every time he or she drives it. Prouse, 440 U.S. at 662-63 ("Were the individual subject to unfettered governmental intrusion every time he entered an automobile, the security guaranteed by the Fourth Amendment would be seriously circumscribed."). Furthermore, the governmental interest here is not nearly as strong as that in Brignoni-Ponce of developing "effective measures to prevent the illegal entry of aliens at the Mexican border," 422 U.S. at 878-79, but is more like that in Prouse— "ensuring that . . . licensing, registration, and vehicle inspection requirements are

being observed," 440 U.S. at 658. In fact, the Supreme Court described part of the interest at stake here—the apprehension of stolen vehicles—as indistinguishable "from the general interest in crime control." Id. at 659 n.18.

Even more relevant is the Supreme Court's finding in Brignoni-Ponce that a single factor—the apparent Mexican ancestry of the vehicle's occupants—was not enough to furnish a reasonable suspicion that the occupants were illegal aliens. 422 U.S. at 885-86. Likewise, the likelihood that a color discrepancy such as that at issue here indicates a stolen vehicle may be high enough to make it a relevant factor, but standing alone, it does not justify initiating a stop to determine if the law has been violated. The deputy here needed more indicia of a violation to distinguish between an illegal transfer of license plates, for example, and a legal decision to paint one's vehicle. Conducting an investigatory stop based on a color discrepancy only when that discrepancy exists in conjunction with additional factors indicating potential criminal activity still protects the government's interests, while also preserving a motorist's right of freedom from arbitrary interference by law enforcement. We find that the governmental interest in this case is outweighed by Teamer's constitutional rights, and the investigatory stop was not warranted.

"Under the exclusionary rule announced by the United States Supreme Court, 'the Fourth Amendment bar[s] the use of evidence secured through an

- 15 -

illegal search and seizure.' " Hilton, 961 So. 2d at 293 (alteration in original) (quoting Mapp v. Ohio, 367 U.S. 643, 648 (1961) (holding that the federal exclusionary rule applies to the states as well)). "Whether the exclusionary sanction is appropriately imposed in a particular case . . . is 'an issue separate from the question whether the Fourth Amendment rights of the party seeking to invoke the rule were violated by police conduct.' " United States v. Leon, 468 U.S. 897, 906 (1984) (quoting Illinois v. Gates, 462 U.S. 213, 223 (1983)).

The primary rationale behind the exclusionary rule is to deter law enforcement from violating constitutional rights. Terry, 392 U.S. at 12; see also United States v. Calandra, 414 U.S. 338, 348 (1974) ("[T]he rule is a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect."). The instant case is not one in which the exclusionary rule "is powerless to deter invasions of constitutionally guaranteed rights [because] the police either have no interest in prosecuting or are willing to forgo successful prosecution in the interest of serving some other goal." Terry, 392 U.S. at 14. Applying the exclusionary rule here would have the required deterrent effect. See, e.g., Prouse, 440 U.S. at 651, 663 (affirming the trial court's judgment granting the defendant's motion to suppress).

Further, the State has not demonstrated that any exceptions apply. Brown v. Illinois, 422 U.S. 590, 604 (1975) (discussing whether to apply an exception to the

exclusionary rule and stating that "the burden of showing admissibility rests, of course, on the prosecution"). The State argues a variation of the good faith exception to the exclusionary rule. This exception was first found to apply whenever a law enforcement officer conducts a search while relying, in good faith, upon a defective search warrant. Leon, 468 U.S. at 922; Massachusetts v. Sheppard, 468 U.S. 981, 987-89 (1984). Over time, however, the Supreme Court extended this exception to other factual scenarios, including searches where police acted in objectively reasonable reliance on binding judicial precedent. Davis v. United States, 131 S. Ct. 2419, 2428 (2011). However, the rule of Davis has no application to the present case because the Aders decision was issued on July 27, 2011—more than one year after the stop of Teamer's vehicle. Thus Aders was not binding precedent on which the deputy could have relied.

Despite this fact, the State argues that the good faith exception should still apply because the deputy here "arrived at a conclusion shared by non-binding courts in other jurisdictions,[6] and later shared by the Fourth District" in Aders. However, there are also nonbinding courts in other jurisdictions that have arrived at the exact opposite conclusion. United States v. Uribe, No. 2:10-cr-17-JMS-CMM, 2011 WL 4538407 (S.D. Ind. Sept. 28, 2011); Commonwealth v. Mason,

_____

6. Smith v. State, 713 N.E.2d 338, 341 (Ind. Ct. App. 1999); Andrews v. State, 658 S.E.2d 126, 127-28 (Ga. Ct. App. 2008).

- 17 -

78 Va. Cir. 474 (Cir. Ct. 2009), aff'd, No. 1956-09-2, 2010 WL 768721 (Va. Ct. App. Mar. 9, 2010). We are satisfied that the exclusionary rule will have an appropriate deterrent effect in this case and that none of the exceptions to the rule apply.

## CONCLUSION

Based on the foregoing, we disapprove the decision of the Fourth District in Aders v. State, 67 So. 3d 368 (Fla. 4th DCA 2011), and approve the First District's decision in Teamer v. State, 108 So. 3d 664 (Fla. 1st DCA 2013), reversing the trial court's judgment and sentence and ordering that Teamer be discharged.

It is so ordered.

LABARGA, C.J., and PARIENTE, LEWIS, and PERRY, JJ., concur.
CANADY, J., dissents with an opinion in which POLSTON, J., concurs.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.


CANADY, J., dissenting.

Because I conclude that the traffic stop of Kerrick Van Teamer's vehicle was based on a reasonable suspicion of criminal activity and that the trial court therefore correctly denied the motion to suppress, I dissent from the majority's approval of the First District Court of Appeal's decision reversing Teamer's judgment and sentence and ordering that he be discharged. I would quash the

decision of the First District on review and approve the decision of the Fourth District in <u>Aders v. State</u>, 67 So. 3d 368 (Fla. 4th DCA 2011).

**I.**

"The Fourth Amendment permits brief investigative stops—such as the traffic stop in this case—when a law enforcement officer has 'a particularized and objective basis for suspecting the particular person stopped of criminal activity.' " <u>Navarette v. California</u>, 134 S. Ct. 1683, 1687 (2014) (quoting <u>United States v. Cortez</u>, 449 U.S. 411, 417-18 (1981)). This rule is rooted in <u>Terry v. Ohio</u>, 392 U.S. 1 (1968), where "the [Supreme] Court implicitly acknowledged the authority of the police to make a <u>forcible stop</u> of a person when the officer has reasonable, articulable suspicion that the person has been, is, or is about to be engaged in criminal activity." <u>United States v. Place</u>, 462 U.S. 696, 702 (1983).

The <u>Terry</u> rule recognizes that "[t]he Fourth Amendment requires 'some minimal level of objective justification' for making the stop." <u>United States v. Sokolow</u>, 490 U.S. 1, 7 (1989) (quoting <u>Immigration & Naturalization Serv. v. Delgado</u>, 466 U.S. 210, 217 (1984)). Reasonable suspicion thus requires "something more than an 'inchoate and unparticularized suspicion or "hunch." ' " <u>Sokolow</u>, 490 U.S. at 7 (quoting <u>Terry</u>, 392 U.S. at 27). "A determination that reasonable suspicion exists, however, need not rule out the possibility of innocent conduct." <u>United States v. Arvizu</u>, 534 U.S. 266, 277 (2002). In permitting

detentions based on reasonable suspicion, "Terry accepts the risk that officers may stop innocent people." Illinois v. Wardlow, 528 U.S. 119, 126 (2000). But when a stop lacks an objective basis, "the risk of arbitrary and abusive police practices exceeds tolerable limits." Brown v. Texas, 443 U.S. 47, 52 (1979). Courts making "reasonable-suspicion determinations . . . must look at the 'totality of the circumstances' of each case." Arvizu, 534 U.S. at 273.

The rule authorizing stops based on reasonable suspicion—which embodies an "exception to the probable-cause requirement"—rests on the Supreme Court's "balancing of the competing interests to determine the reasonableness of the type of seizure involved within the meaning of 'the Fourth Amendment's general proscription against unreasonable searches and seizures.' " Place, 462 U.S. at 703 (quoting Terry, 392 U.S. at 20). This balancing process involves weighing "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." Id. "A central concern in balancing these competing considerations in a variety of settings has been to assure that an individual's reasonable expectation of privacy is not subject to arbitrary invasions solely at the unfettered discretion of officers in the field." Brown, 443 U.S. at 51. The Supreme Court's categorical authorization of brief investigative detentions based on a reasonable suspicion of criminal activity flows from the conclusion that "[w]hen the nature and extent of

the detention are minimally intrusive of the individual's Fourth Amendment interests, the opposing law enforcement interests can support a seizure based on less than probable cause." Place, 462 U.S. at 703.

## II.

Here, the officer's suspicion was aroused by the discrepancy between the color of the vehicle driven by Teamer and the color that was indicated in the registration information for the vehicle associated with the license tag on Teamer's vehicle. Because of this discrepancy, a reasonable officer could suspect that the license tag may have been illegally transferred from the vehicle to which it was assigned. Although the color discrepancy was not necessarily indicative of illegality, it constituted "a particularized and objective basis for suspecting the particular person stopped of criminal activity." Navarette, 134 S. Ct. at 1687 (quoting Cortez, 449 U.S. at 417-18). The color discrepancy was "something more than an 'inchoate and unparticularized suspicion or "hunch." ' " Sokolow, 490 U.S. at 7 (quoting Terry, 392 U.S. at 27). I would therefore conclude that the officer had the "minimal level of objective justification" necessary to conduct a stop for the purpose of further investigating the discrepancy. Sokolow, 490 U.S. at 7 (quoting Delgado, 466 U.S. at 217).

"It is not uncommon for members of the same court to disagree as to whether the proper threshold for reasonable suspicion has been reached." William

- 21 -

E. Ringel, Searches & Seizures Arrests & Confessions § 11:12 (Westlaw database updated March 2014). On the issue presented by this case, different courts have disagreed regarding whether the color discrepancy was sufficient to establish reasonable suspicion. Compare Aders, 67 So. 3d at 371 (holding that "[a] color discrepancy is enough to create a reasonable suspicion in the mind of a law enforcement officer of the violation of . . . criminal law"); United States v. Uribe, 709 F.3d 646 (7th Cir. 2013) (same); Andrews v. State, 658 S.E. 2d 126 (Ga. Ct. App. 2008) (same); Smith v. State, 713 N.E. 2d 338 (Ind. Ct. App. 1999) (same); with Van Teamer, 108 So. 3d 664 (Fla. 1st DCA 2013) (holding that color discrepancy alone does not warrant an investigatory stop); United States v. Uribe, 2:10-cr-17-JMS-CMM, 2011 WL 4538407 (S.D. Ind. Sept. 28, 2011) (same); Commonwealth v. Mason, No. 1956-09-2, 2010 WL 768721 (Va. Ct. App. Mar. 9, 2010) (same). Different views on this question are no doubt influenced by divergent judgments regarding the likelihood that the color discrepancy had an innocent explanation—namely, the repainting of the vehicle after it was registered—and was not indicative of illegality. The courts in fact have no empirical basis for reaching a conclusion about that likelihood. But a stop predicated on such a color discrepancy unquestionably falls outside the category of "arbitrary invasions solely at the unfettered discretion of officers in the field."

Brown, 443 U.S. at 51.  A stop in such circumstances cannot fairly be called an "arbitrary and abusive" police practice.  Id. at 52.

The crux of the majority's decision in this case is its conclusion that finding "reasonable suspicion based on this single noncriminal factor would be to license investigatory stops on nothing more than an officer's hunch."  Majority op. at 10. This conclusion suggests a categorical rule that is not consistent with the framework established in the Supreme Court's Fourth Amendment jurisprudence. Although the totality of the circumstances must be taken into account in every case, that does not mean that an officer's reliance on a "single noncriminal factor" —such as the vehicle color discrepancy here—is the equivalent of a "hunch."  The majority is wholly unjustified in categorizing an undeniably objective factor as a hunch.  The majority's "effort to refine and elaborate the requirements of 'reasonable suspicion' in this case creates unnecessary difficulty in dealing with one of the relatively simple concepts embodied in the Fourth Amendment." Sokolow, 490 U.S. at 7-8.

The two cases on which the majority places primary reliance do not support the majority's line of analysis.  In United States v. Brignoni-Ponce, 422 U.S. 873, 876 (1975), the Supreme Court considered "whether a roving patrol may stop a vehicle in an area near the border and question its occupants when the only ground for suspicion is that the occupants appear to be of Mexican ancestry."  The

Supreme Court concluded that "Mexican appearance" "standing alone . . . does not justify stopping all Mexican-Americans to ask if they are aliens." Id. at 887. The Supreme Court's rejection of stops based purely on ethnic classification does not support the conclusion that all stops where the officer relies on "a single noncriminal factor" are unconstitutional. Nor does Delaware v. Prouse, 440 U.S. 648, 655 (1979), where the Supreme Court rejected Delaware's argument "that patrol officers be subject to no constraints in deciding which automobiles shall be stopped for a license and registration check because the State's interest in discretionary spot checks as a means of ensuring the safety of its roadways outweighs the resulting intrusion on the privacy and security of the persons detained." Prouse thus does not address the issue of reasonable suspicion, and it sheds no light on whether reasonable suspicion existed in the case on review here.

## III.

The officer's stop of Teamer did not transgress the requirements of the Fourth Amendment. The decision of the First District should be quashed, and Teamer's conviction and sentence should remain undisturbed.

POLSTON, J., concurs.

Application for Review of the Decision of the District Court of Appeal – Direct Conflict of Decisions

First District – Case No. 1D11-3491

(Escambia County)

- 24 -

Pamela Jo Bondi, Attorney General, Trisha Meggs Pate, Tallahassee Bureau Chief, Criminal Appeals, and Jay Kubica, Assistant Attorney General, Tallahassee, Florida,

for Petitioner

Nancy A. Daniels, Public Defender, and Richard M. Summa, Assistant Public Defender, Tallahassee, Florida,

for Respondent