NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING
MOTION AND, IF FILED, DETERMINED

IN THE DISTRICT COURT OF APPEAL

OF FLORIDA

SECOND DISTRICT

MELISSA PETERSON,                          )
                                           )
          Appellant,                       )
                                           )
v.                                         )          Case No. 2D17-1324
                                           )
STATE OF FLORIDA,                          )
                                           )
          Appellee.                        )
                                           )
_____    )

Opinion filed March 6, 2019.

Appeal from the Circuit Court for DeSoto
County; Kimberly Bonner, Judge.

Howard L. Dimmig, II, Public Defender,
and Tosha Cohen, Assistant Public
Defender, Bartow, for Appellant.

Ashley Moody, Attorney General,
Tallahassee, and Elba Caridad Martin,
Assistant Attorney General, Tampa, for
Appellee.


MORRIS, Judge.

          Melissa Peterson appeals her judgment and sentences for possession of

a controlled substance, possession of marijuana (not more than twenty grams), two

counts of possession of paraphernalia, and one count of conspiracy to introduce

contraband into a detention facility. Because we conclude that there was no valid basis for law enforcement to conduct a traffic stop and that law enforcement did not have a reasonable suspicion that she had committed or was about to commit a crime, we reverse the judgment and sentences.

## BACKGROUND

The charges in this case were based on events that occurred on February 27, 2016. Peterson filed motions to suppress arguing that Desoto County Sheriff's Deputy Matthew Proudfit lacked probable cause to conduct a traffic stop based solely on her failure to maintain a single lane of traffic where her conduct did not create a reasonable safety concern. She also argued that information that a jail visitation clerk had relayed to Deputy Proudfit about a conversation between Peterson and a jail inmate did not provide Deputy Proudfit with a reasonable suspicion that Peterson had committed or was about to commit a crime. Thus Peterson argued that an investigatory stop was not warranted.[1]

At the suppression hearing, the jail visitation clerk testified that as part of her duties, she listens to phone calls between inmates and their visitors "if it [is] warrant[ed]" and she "know[s] that something[] . . . needs to be listened to." The clerk also testified that she handles all money that is deposited into inmate accounts. The clerk acknowledged that she was not a law enforcement officer and had not had any type of law enforcement training or certification. Because the clerk had noticed that

---

[1]Peterson also raised the issues of the failure of Deputy Proudfit to provide a warning pursuant to Miranda v. Arizona, 384 U.S. 436 (1966), and the lack of probable cause to search her or arrest her based on her admission that she had a weapon because section 790.25(5), Florida Statutes (2015), was applicable and provided an exception to the prohibition against possession of a concealed firearm without a permit. However, she does not raise these issues on appeal.

Peterson was depositing money into several different inmate accounts, she decided she needed to listen to a phone call between Peterson and her boyfriend, who was an inmate. During the phone call, the clerk overheard Peterson's boyfriend ask Peterson whether another woman, nicknamed "Buck Wild," did what the boyfriend had asked her to do. After further discussion about whether the unnamed act had occurred, the boyfriend told Peterson, "[Y]ou cannot do it, you know, during the week and in the daytime. [I]t has to be done at night." When asked whether the boyfriend ever actually described what "it" was, the clerk responded: "They were going to try to bring in some contraband . . . . And he said, I want her to bring it and put it at the spot where I told you."

The clerk also testified about a visitation call between Peterson and the boyfriend. During that call, the boyfriend reportedly asked Peterson, "[D]id you bring something with you?" Peterson responded, "Yeah, me." The boyfriend then asked, "[D]id you bring your gold?" Peterson responded affirmatively. The clerk testified that the boyfriend asked Peterson whether she knew how to smoke, while making a gesture as if he was smoking a cigarette, and he then asked Peterson, "[D]o you know where the spot is that I told you?" Peterson responded affirmatively. The boyfriend then told her: "[N]ot in the daytime. Has to be done at night, and not on the weekends." Peterson responded, "[O]kay, well, I'll have to drop back over here."

The clerk was able to visually observe Peterson on a video monitor during the visitation call. The clerk testified that Peterson appeared to be under the influence of something because Peterson "was laying her head down, and her eyes were going closed and she would just stop talking." The clerk also testified that she noticed that

Peterson's eyes were rolling in the back of her head. Based on Peterson's conduct, the clerk felt that she needed to report her observations to someone because she was concerned that if Peterson drove away from the jail, she could hurt or kill herself or someone else. The clerk watched Peterson leave the jail and get back into her vehicle. As Peterson walked past the clerk, the clerk observed that Peterson's eyes were dilated and that "she was visibly high." The clerk subsequently observed Peterson slumped over the steering wheel of the vehicle, and the clerk explained that Peterson sat out in her car for approximately thirty to thirty-five minutes before driving away. The clerk testified that she relayed all of the information that she testified to at trial to the narcotics unit of the Desoto County Sheriff's Office.

A Desoto County Sheriff's Deputy testified that he was initially alerted to watch for Peterson's vehicle by his supervisor, a Desoto County Sheriff's Sergeant. The deputy explained that he and fellow deputies were setting up surveillance of Peterson because the visitation clerk "overheard some recordings that there was possibly going to be a drug drop at the jail." The deputy testified that he and the other deputies were watching to see if Peterson "was going to . . . throw something over the gate." The deputy further testified that after Peterson failed to do so and began to drive away, the deputies decided to follow her and "wait for probable cause to stop [her]." The deputy admitted that he was not aware of the specific details (i.e., "that no drop would occur that day" and that Peterson "was not going to do anything in the daytime") overheard by the visitation clerk.

The deputy came into contact with Peterson after stopping her vehicle because she failed to maintain a single lane of traffic on two occasions. The deputy

was asked whether the traffic stop was for "a potential DUI driver," and he responded, "I did not assume she was under any impairment at that time, no." The deputy admitted that there was no oncoming traffic, that the stop occurred during the daytime, that Peterson was traveling on a one-way street, and that there were no bikes in the bike lanes next to Peterson's lane of travel. The deputy also admitted that he did not observe Peterson impact traffic in any way when her vehicle crossed over the line and that he did not see any pedestrians in the area. The deputy was asked whether the traffic stop was initiated as "a proxy to make contact . . . and conduct a search if possible." The deputy candidly responded: "We're always looking to get into vehicles, as I work in narcotics and drug and addiction. My main goal is to enter every vehicle I pull over to see what's inside that vehicle. So I was not singling her out by any means."

The sergeant testified that he received the phone call from the visitation clerk relaying the information about what she had overheard. The sergeant testified that the clerk believed "there was going to be some contraband dropped off or delivered to an inmate through Ms. Peterson." More specifically, the clerk relayed that she believed Peterson was "going to drop off an unknown item, possibly drug related, to a trustee." Based on that information, the sergeant instructed other deputies to begin surveillance on Peterson's vehicle. The sergeant acknowledged that neither he nor the other deputies ever observed Peterson participate in a drug drop or drug activity at the jail.

The sergeant came into contact with Peterson after she was stopped for the traffic violation. During the traffic stop, Peterson made a statement indicating that she had weapons in the vehicle. As a result, Peterson's purse was searched and drugs were found. At that point, Peterson was arrested.

The prosecutor argued to the trial court, in relevant part, that the stop of Peterson's vehicle was justified because the deputies had received a tip from a citizen informant and that, therefore, the tip should be considered at the high end of the reliability scale. While acknowledging that under Florida case law, it was "questionable" whether or not the traffic stop was valid because Peterson had not interfered with traffic, the prosecutor argued that the information that had been relayed by the visitation clerk was sufficient to justify an investigatory stop because "law enforcement had information that drugs were in the vehicle" and that "there was an intent to actually get them into the jail."

In response, the defense argued that based on Crooks v. State, 710 So. 2d 1041 (Fla. 2d DCA 1998), the deputies lacked an objective basis to conduct a traffic stop because Peterson's failure to maintain a single lane of traffic did not create a reasonable safety concern. Addressing the investigatory stop, defense counsel argued that there was no evidence that a crime had occurred because the deputies failed to observe a drug drop at the jail as they had anticipated.

The trial court denied Peterson's suppression motions, concluding that the stop was justified because "the information provided as far as what happened at the jail visitation was sufficient to justify an investigatory detention." The trial court also apparently concluded that Peterson committed a traffic violation, finding that "the civil infractions . . . did occur." But the trial court acknowledged that "Crooks has been whittled away . . . so many times" and that "it gives you very little teeth to go on in those kinds of stops."

After the suppression motions were denied, Peterson entered into a plea agreement whereby she agreed to plead no contest to the charges.[2] Adjudication was withheld on the counts for possession of a controlled substance (count I) and possession of marijuana (not more than twenty grams) (count II), and she was sentenced to twenty-four months of drug offender probation for count I and to time served on count II. As to the counts for possession of paraphernalia (counts III and IV), Peterson was adjudicated guilty and sentenced to time served. And for the count for conspiracy to introduce contraband into a detention facility (count V), she was adjudicated guilty and sentenced to twenty-four months' drug offender probation concurrent with the sentence for count I. The defense reserved its right to appeal the dispositive motions to suppress.

## ANALYSIS

In reviewing an order denying a motion to suppress, we afford "a presumption of correctness" to the circuit court's findings of fact, but we review mixed questions of law and fact de novo. Pasha v. State, 225 So. 3d 688, 703 (Fla. 2017) (quoting Wyche v. State, 987 So. 2d 23, 25 (Fla. 2008)).

Generally, traffic stops are deemed reasonable "where the police have probable cause to believe that a traffic violation has occurred." Langello v. State, 970 So. 2d 491, 492 (Fla. 2d DCA 2007) (quoting Whren v. United States, 517 U.S. 806, 810 (1996)). The validity of a traffic stop is judged on an objective basis, and therefore, "the subjective knowledge, motivation, or intention of the individual officer involved [is]

_____

[2]Peterson had initially been charged with possession of a controlled substance with intent to sell or deliver, but the State amended the information to reduce the charge to possession of a controlled substance.

wholly irrelevant." Hurd v. State, 958 So. 2d 600, 602 (Fla. 4th DCA 2007) (citing Holland v. State, 696 So. 2d 757, 759 (Fla. 1997)). Here, the transcript reflects that no traffic violation occurred.

> Section 316.089(1), Florida Statutes (2015), provides in relevant part that
>
> [w]henever any roadway has been divided into two or more clearly marked lanes for traffic . . . [a] vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety.

This court, along with other Florida appellate courts, has refused to find a violation of this statute where a driver's failure to maintain a single lane did not endanger himself or herself or anyone else. See, e.g., Crooks, 710 So. 2d at 1043 (explaining that a violation of section 316.089 "does not occur in isolation, but requires evidence that the driver's conduct created a reasonable safety concern" and thus reversing appellant's conviction where there was no evidence how far into the right-hand emergency lane appellant drove on three occasions and where there was no objective evidence that appellant failed to ascertain that his movements could be made with safety)[3]; Hurd, 958 So. 2d at 603 ("[T]he failure to maintain a single lane alone cannot establish probable cause when the action is done safely."). And while a driver's failure to maintain a single lane, coupled with a suspicion of impairment, unfitness, or vehicle defects, can give rise

---

[3]We acknowledge that, in application, Crooks presents challenges to law enforcement officers who are asked to make split-second decisions as to whether a driver's conduct creates a reasonable safety concern. What may be a reasonable safety concern under one set of facts may not rise to that level under a slightly different set of facts. For that reason, the legislature may want to consider whether section 316.089(1) should be clarified to provide law enforcement with better guidance as to the scope of what constitutes a reasonable safety concern.

to probable cause for purposes of a traffic stop,[4] there was no testimony that such circumstances existed in this case. Compare Jordan v. State, 831 So. 2d 1241, 1243 (Fla. 5th DCA 2002) (holding that traffic stop was unlawful where officer's testimony established that no other vehicles were in danger due to appellant's failure to maintain single lane and where there was no testimony that appellant was intoxicated or otherwise impaired or that he had been driving erratically); with State v. Davidson, 744 So. 2d 1180, 1181 (Fla. 2d DCA 1999) (concluding that deputy's observations of appellant maintaining low speeds and continually drifting across the line and jerking vehicle in opposite direction provided deputy with founded suspicion to conduct traffic stop where actions were consistent with those of an impaired driver), and Dep't of Highway Safety & Motor Vehicles v. DeShong, 603 So. 2d 1349, 1352 (Fla. 2d DCA 1992) (recognizing that "a legitimate concern for the safety of the motoring public can warrant a brief investigatory stop to determine whether a driver is ill, tired, or driving under the influence in situations less suspicious than that required for other types of criminal behavior").

Here, the deputy testified that he observed Peterson's vehicle cross the solid white line twice within a mile-and-a-half distance. However, the deputy acknowledged: (1) this occurred on a one-way street with a bike lane on each side, (2) there was no oncoming traffic, (3) he did not see any bicycles on the street at the time, (4) he did not see any pedestrians affected, (5) Peterson's conduct did not impact traffic in any way, and (6) he did not assume that Peterson was under any impairment at that time. We hold that because there was no evidence that Peterson's crossing the white

---

[4]See Hurd, 958 So. 2d at 603.

- 9 -

line on two occasions created a reasonable safety concern, the deputy did not have probable cause to believe that Peterson violated section 316.089(1).  Consequently, the traffic stop could not be justified on that basis, and we must next determine whether an investigatory stop was warranted based on the other information relayed from the jail visitation clerk to the sergeant.

"[P]olice can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause."  State v. Teamer, 151 So. 3d 421, 425 (Fla. 2014) (quoting United States v. Sokolow, 490 U.S. 1, 7 (1989)); see also Davis v. State, 695 So. 2d 836, 837 (Fla. 2d DCA 1997).  A mere suspicion of a crime is not enough.  Teamer, 151 So. 3d at 426.  Thus, where a person's conduct is consistent with both criminal and noncriminal activity, such facts do not give rise to a reasonable suspicion of a crime.  See Carter v. State, 454 So. 2d 739, 742 (Fla. 2d DCA 1984) (concluding that where appellant's conduct "was at least equally consistent with noncriminal activity" and where officers admitted they had a bare suspicion that appellant was engaging in unlawful activity, there was no founded suspicion to justify an investigatory stop).

In determining whether an officer had reasonable suspicion of a crime, we must consider the facts available to the officer and the totality of the circumstances. See Teamer, 151 So. 3d at 426.  This determination must be viewed "from the standpoint of an objectively reasonable police officer," and "the officer's subjective intentions are not involved in the determination of reasonableness."  Id. (first quoting Ornelas v. United States, 517 U.S. 690, 696 (1996); and then quoting Hilton v. State,

- 10 -

961 So. 2d 284, 294 (Fla. 2007)). "Reasonable suspicion, like probable cause, is dependent upon both the content of information possessed by police and its degree of reliability." Alabama v. White, 496 U.S. 325, 330 (1990). "Both factors—quantity and quality—are considered in the 'totality of the circumstances—the whole picture.' " Id. (quoting United States v. Cortez, 449 U.S. 411, 417 (1981)).

Here, there is no dispute that the tip concerning Peterson's possible involvement in a drug drop at the jail came from a known citizen informant. Such a tip ordinarily "falls at a higher end of the reliability scale." Baptiste v. State, 995 So. 2d 285, 291 (Fla. 2008). The problem in this case is not the reliability of the visitation clerk. Rather, the problem is that the information relayed by the clerk consisted of nothing more than vague portions of a conversation that the clerk construed as suspicious coupled with the clerk's assumption that Peterson was under the influence of drugs based on her physical demeanor. The information did not create or support a reasonable suspicion that Peterson had committed, was committing, or was about to commit a crime. Cf. Cooks v. State, 28 So. 3d 147, 149-150 (Fla. 1st DCA 2010) (explaining that tip from citizen informant, a hotel clerk, was not reliable "in its assertion of illegality" where tip consisted of the informant's hunch that appellant might have been planning to rob her based on his suspicious activity but where the information relayed did not create a reasonable suspicion that appellant had committed, was committing, or was about to commit a crime (quoting Florida v. J.L., 529 U.S. 266, 272 (2000))); R.E. v. State, 536 So. 2d 1125, 1128 (Fla. 1st DCA 1988) (holding that where citizen informant's claim of suspicious activity had a "minimal objective basis and, except for innocent details of identification, is uncorroborated by law enforcement's subsequent

observations," there was no reasonable suspicion that "crime [wa]s afoot, which is essential if a report of generalized, allegedly suspicious activity is to justify a stop"); Hall v. State, 366 So. 2d 865, 865-866 (Fla. 4th DCA 1979) (holding that where citizen informant, a retail store manager, alerted police that appellant and another man were acting suspiciously but where officer did not observe appellant do anything suspicious, there was no basis for an investigatory stop).

The visitation clerk reportedly heard Peterson and her boyfriend discussing Peterson bringing "gold" with her and about something needing to be done by either a third party or Peterson "at night" and "during the week" and the boyfriend asking Peterson if she knew "where the spot is that I told you." Based on these statements, the clerk assumed that Peterson and her boyfriend were arranging a drug drop at the jail. But such generalized statements did not evince that a crime had been committed, was being committed, or was about to occur. Further, the clerk acknowledged that she was not a law enforcement officer and had no law enforcement certification or training, and there was no other evidence that the clerk had any expertise in identifying possible drug transactions based on the language used. Also notable is the fact that the deputies did not observe Peterson engage in a drug drop at the jail or any other suspicious conduct prior to conducting the traffic stop.

Moreover, even if Peterson was under the influence of drugs at the jail, the State has not established that her being in that condition—without more—constitutes a crime under any Florida law. At most, the visitation clerk's relaying of Peterson's physical condition to the officers might have provided reasonable suspicion to conduct a traffic stop for driving under the influence of drugs. See § 316.193(1)(a), Fla. Stat.

- 12 -

(2015) (describing offense of driving under the influence of a controlled substance). However, here, the deputy rejected the notion that he was attempting to conduct a "potential DUI stop," explaining that he did not assume that Peterson was impaired at the time he performed the traffic stop. Thus the only information which could have formed the basis for an investigatory stop was the content of Peterson's conversation with her boyfriend that was overheard and relayed by the visitation clerk. But as already explained herein, that conversation consisted of nothing more than generalized, allegedly suspicious statements which did not result in any observed criminal conduct. Accordingly, that information could not have provided a reasonable suspicion that Peterson had committed, was committing, or was about to commit a crime. And, therefore, the traffic stop could not be justified on that basis.

Because the traffic stop was not supported by probable cause that Peterson had committed a violation of section 316.089(1) or by a reasonable suspicion that Peterson had committed, was committing, or was about to commit a crime, the trial court should have granted Peterson's dispositive motions to suppress. Accordingly, we reverse and remand with instructions to grant the dispositive motions to suppress and to vacate the convictions and sentences in this case.

Reversed and remanded with instructions.


KELLY and SLEET, JJ., Concur.