DISTRICT COURT OF APPEAL OF FLORIDA
SECOND DISTRICT

_____

ELLIOTT DAVID DANIELS,

Appellant,

v.

STATE OF FLORIDA,

Appellee.

No. 2D21-702

_____

September 9, 2022

Appeal from the County Court for Sarasota County; Erika N. Quartermaine, Judge.

Howard L. Dimmig, II, Public Defender, and Daniel Muller, Assistant Public Defender, Bartow, for Appellant.

Ashley Moody, Attorney General, Tallahassee, and Laurie Benoit-Knox, Assistant Attorney General, Tampa, for Appellee.

PER CURIAM.

Elliott David Daniels appeals a final judgment and sentences

for a misdemeanor count of DUI pursuant to section 316.193,

Florida Statutes (2019), and a misdemeanor count of refusal to

submit to testing pursuant to section 316.1939(1). We conclude that the trial court did not err in finding that the law enforcement officers who initially interacted with Daniels had reasonable suspicion to conduct a DUI investigation and, therefore, that the trial court properly denied Daniels' motion to suppress. However, while we affirm Daniels' judgment and sentences, we write to explain our reasoning due to the unique facts in this case.

## BACKGROUND

At approximately 8:30 p.m. on April 13, 2020, a citizen informant (CI) contacted 911 to report finding Daniels asleep in his truck with the lights on. A video, which was admitted by stipulation, reflects that the truck was parked in a business parking lot but was situated within the entrance/exit and facing outwards as if Daniels was preparing to pull out onto the adjacent road.

Initially, at least two deputies with the Sarasota County Sheriff's Office responded to the scene. Those deputies called for an ambulance to have EMS conduct a welfare check, a point that Daniels does not dispute. However, Deputy Dustin Bell—the State's lone witness at the suppression hearing—testified that at some

2

point, the deputies at the scene called for him to come to the scene "for a possible DUI."

Deputy Bell testified that he arrived within ten minutes of the first deputies but by that time, the EMS technicians had already arrived, determined that Daniels was not having any medical issues, and left the scene. Deputy Bell first spoke with the CI who had called 911. Deputy Bell testified that the CI suggested that Daniels might be intoxicated. And indeed, the video reflects that the CI told Deputy Bell that when he first encountered Daniels, Daniels was slumped over in his seat with his seatbelt on; the CI believed that Daniels had either had a medical incident or that he was drunk. The video also reflects that the CI told Deputy Bell that once he saw Daniels' fingers move, he [the CI] believed that Daniels was likely intoxicated.

Deputy Bell then made contact with Daniels who was already awake and outside of his vehicle, having already been checked and cleared by the initial EMS technicians. Deputy Bell told Daniels that he was with the sheriff's office, that he worked with the DUI unit, and that he was there "to make sure that there is not an instance of DUI occurring." Deputy Bell noticed that Daniels

appeared lethargic and had bloodshot, watery eyes. Daniels explained that he had been working in the sun all day and was extremely tired, which resulted in him pulling into the parking lot to sleep. Daniels also told Deputy Bell that he was diabetic, prompting Deputy Bell to call for EMS to return to conduct a blood sugar check. Once EMS returned, the technicians conducted the blood sugar check and determined that it was normal. Based on the fact that Daniels had been medically cleared, Deputy Bell suspected that Daniels was intoxicated. Deputy Bell obtained consent from Daniels to conduct field sobriety tests, which Daniels failed. Daniels was then arrested.

Daniels filed a motion to suppress arguing that he should have been released once the first EMS technicians medically cleared him. He contended that nothing at that time provided reasonable suspicion for an investigative stop. At the suppression hearing, Daniels further argued that merely sleeping in a legally parked vehicle could not provide reasonable suspicion. He noted that he had not committed a traffic violation and that Deputy Bell admitted he had not smelled any alcohol or drugs during the incident.

4

Ultimately, the trial court entered an order denying Daniels' motion, concluding that "during the course of a welfare check[,] law enforcement developed reasonable suspicion to conduct a DUI investigation," citing *Dermio v. State*, 112 So. 3d 551 (Fla. 2d DCA 2013). Daniels subsequently entered a plea of nolo contendere, reserving his right to appeal the denial of the dispositive suppression motion. The trial court adjudicated him guilty and sentenced him to twelve months' probation on both charges with various DUI conditions, a $500 fine, revocation of his driver's license for six months, fifty hours of community service, and court costs.

## ANALYSIS

We employ a mixed standard of review for orders denying suppression motions. We give deference to a trial court's factual findings if they are supported by competent, substantial evidence, *Dermio*, 112 So. 3d at 555, but we review the legal conclusions de novo, *State v. Teamer*, 151 So. 3d 421, 425 (Fla. 2014).

Daniels does not dispute that based on the condition in which the CI found him, the first law enforcement officers that arrived were justified in conducting a welfare check. Case law clearly

5

provides that law enforcement may conduct such checks when necessary and that they do not rise to the level of an unconstitutional stop or seizure. *Dermio*, 112 So. 3d at 555 ("It is well recognized that police officers may conduct welfare checks and that such checks are considered consensual encounters that do not involve constitutional implications." (citing *Greider v. State*, 977 So. 2d 789, 792 (Fla. 2d DCA 2008))); *Taylor v. State*, 326 So. 3d 115, 117 (Fla. 1st DCA 2021) (noting that welfare checks fall under the "community caretaking doctrine" and explaining that they can be deemed lawful as long as they are "totally [divorced] from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute" (quoting *Cady v. Dombroski*, 413 U.S. 433, 441 (1973))), *disagreed with on other grounds by State v. Fernandez*, 335 So. 3d 784 (Fla. 2d DCA 2022); *cf. State v. Baez*, 894 So. 2d 115, 116 (Fla. 2004) (involving issue of continued detention after appellant voluntarily provided his driver's license but classifying initial encounter which began with a welfare check as "consensual" in nature).

However, once a police officer's concern for the welfare of the person has been satisfied, a continued detention is not permissible

unless the police officer has reasonable suspicion that the person has committed or is committing a crime. *See Greider*, 977 So. 2d at 792-93 (explaining that an investigatory stop must be based on a well-founded suspicion of criminal activity that is based on more than a mere hunch and further concluding that where the officer's concern for the appellant's safety had been dispelled and where the officer admitted that he did not think any criminal activity had occurred, the officer lacked authority to detain the appellant further); *Bozeman v. State*, 603 So. 2d 585, 586 (Fla. 2d DCA 1992) (holding that where the appellant had been slumped over his steering wheel and woke up mumbling but where he passed sobriety tests and the law enforcement officer determined that he was fit to drive, "his continued detention and warrantless search were illegal"); *Taylor*, 326 So. 3d at 118 ("Without any reasonable suspicion that criminal activity is or was afoot, the welfare check should end when the need for it ends."); *cf. Baez*, 894 So. 2d at 117 (concluding that where the appellant was found in a "suspicious condition" slumped over the steering wheel in his van near a dimly lit, normally abandoned warehouse area, which was not an area he should have normally been in, the law enforcement officer had

7

sufficient reasonable suspicion to further detain the appellant and run a computer check of his license, which the appellant had voluntarily provided).

Here, Daniel argues that once the concern for his health had been dispelled by the first EMS technicians, he should have been released. He asserts that his continued detention for purposes of a DUI investigation was not supported by any reasonable suspicion that a crime had occurred prior to Deputy Bell's arrival. He further argues that any reasonable suspicion that developed after Deputy Bell physically observed him could not justify the initial detention.

Had Daniels been discovered by the CI parked in a regular parking spot, asleep, with the headlights on, we would have been constrained to reverse absent additional factors that could lead to reasonable suspicion. This is so even if the engine had been running. *Cf. Danielewicz v. State*, 730 So. 2d 363, 364 (Fla. 2d DCA 1999) (concluding that where the appellant was parked in a legal parking spot, with the headlights on and his engine running but where the law enforcement officer observed no traffic infraction, had no reason to believe there was any mechanical problem with the vehicle, and did not testify that he was concerned for the appellant's

8

personal health, the investigative stop was not based on reasonable suspicion); *Delorenzo v. State*, 921 So. 2d 873, 875 (Fla. 4th DCA 2006) (concluding that where the law enforcement officer observed the appellant sleeping in his legally parked vehicle in a public parking lot with the engine running but where the officer did not testify to any observation suggesting that the appellant was either ill or under the influence of alcohol or a controlled substance, there was no reasonable suspicion to support an investigative stop). This court has similarly concluded that being stopped near or partially on the road does not, by itself, give rise to reasonable suspicion of criminal conduct. *See Bent v. State*, 310 So. 3d 470, 471-72 (Fla. 2d DCA 2020).

Yet, when determining whether reasonable suspicion exists, the totality of the circumstances must be considered from the "standpoint of an objectively reasonable police officer." *Teamer*, 151 So. 3d at 426 (first citing *United States v. Cortez*, 449 U.S. 411, 417 (1981); and then quoting *Ornelas v. United States*, 517 U.S. 690, 696 (1996)). Notably, " '[i]nnocent behavior will frequently provide the basis' for reasonable suspicion." *Id.* (quoting *United States v. Sokolow*, 490 U.S. 1, 10 (1989)). And officers may detain

9

individuals to resolve ambiguities about suspicious yet lawful or innocent behavior, *id.* (citing *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000)), because "[t]he relevant inquiry is not whether particular conduct is innocent or guilty, but the degree of suspicion that attaches to particular types of noncriminal acts," *id.* (quoting *Sokolow*, 490 U.S. at 10).

Because Deputy Bell was the State's only witness, we do not know what the CI told the 911 operator, what the CI told the first law enforcement officers on the scene, what the first EMS technicians might have said, or if there were any other factors observed by the first law enforcement officers that suggested to them that Daniels might have been intoxicated. And what the CI told Deputy Bell is irrelevant because it does not bear on whether reasonable suspicion had developed prior to Deputy Bell's arrival.

We do not find the trial court's reliance on *Dermio* persuasive because in that case, we explained in detail the facts that provided the basis for a welfare check, and we concluded that the concern for the appellant's welfare had not subsided prior to the development of reasonable suspicion. 112 So. 3d at 553-54, 556-57. Here, however, it is clear that the initial welfare check had been

10

completed prior to Deputy Bell's arrival. Thus in determining whether the trial court was correct that reasonable suspicion had developed prior to Deputy Bell's arrival, we must focus on the undisputed facts that the first law enforcement officers were aware of: the location of Daniels' truck, the manner in which it was found, and the fact that Daniels was found sleeping in it.

Daniels does not dispute that he had been observed by the CI asleep in his truck with the headlights on in the entrance/exit of a business parking lot. Although Daniels contends that the video does not clearly indicate how far his truck was from a stop sign or the width of the driveway in which his truck was parked, we do not find such facts necessary to our disposition. The odd location of the truck and the direction that the truck was facing along with the fact that the headlights were still on is not supportive of Daniels' explanation that he had pulled over to sleep. The video clearly reflects that Daniels was not parked in a parking spot; he was parked in the entrance/exit to the parking lot. Daniels' truck was also facing outward as if he was about to pull out onto the adjacent road. This is not a typical location that a driver would park his or her vehicle if he or she wanted to sleep. The time of the incident

11

also makes Daniels' explanation less plausible. Daniels was discovered at 8:30 p.m. with his headlights still on. Certainly, during daylight hours, it is conceivable that a driver might forget to turn his or her headlights off when parking his or her vehicle. But at nighttime, when the headlights illuminate the area in front of a vehicle, it is much less likely that a driver would forget to turn them off. These known facts are part of the totality of the circumstances that must be considered from the "standpoint of an objectively reasonable police officer." *Teamer,* 151 So. 3d at 426 (quoting *Ornelas,* 517 U.S. at 696).

Thus at the time the first law enforcement officers arrived, there were only three possible explanations for the way in which Daniels and his truck were found: (1) a medical incident occurred, (2) he was under the influence of something, or (3) he was really tired and had pulled into the parking lot to sleep. But as we already explained, the known facts made Daniels' explanation much less plausible. While it is unknown whether Deputy Bell was called to the scene at the same time as the first EMS technicians, we do know that he was called "for a possible DUI." Thus the first officers must have believed that if Daniels had not had a medical incident,

12

then it was likely that he was intoxicated. The two most plausible reasons for the location of the truck and the manner in which both the truck and Daniels were found were not mutually exclusive. Both could exist at the same time. The fact that one of the possible reasons had been dispelled before Deputy Bell arrived (i.e., that Daniels had had some sort of medical incident) does not mean that reasonable suspicion did not exist. Rather, it merely strengthened the only other *reasonable* possibility: that Daniels was under the influence of something.

We conclude that even if the known facts involved potentially lawful or innocent conduct, they did, at the very least, result in an ambiguous situation under the totality of the circumstances. Thus the officers were permitted to detain him to resolve any ambiguities. *See Teamer*, 151 So. 3d at 426.

Accordingly, we affirm the denial of Daniels' motion to suppress.

KHOUZAM and ATKINSON, JJ., Concur.
MORRIS, C.J., Concurs specially with opinion.

MORRIS, Chief Judge, Specially concurring.

13

This is a very close case, and while I am ultimately in agreement with affirming the judgment and sentences based on the unique facts, I write separately to address what I view as deficiencies in the State's evidence. I am bothered by the State's failure to call as witnesses the CI, the 911 operator who took the CI's phone call, the first law enforcement officers who responded to the scene and who spoke to the CI, and the first EMS technicians. Calling any one of these witnesses might have provided additional facts that could have more strongly supported a finding of reasonable suspicion to justify Daniels' continued detention once he had been medically cleared prior to Deputy Bell's arrival. For example, the CI and the first law enforcement officers on scene could have testified about their initial observations of Daniels and why they suspected Daniels was under the influence of something, the 911 operator could have testified about why he or she dispatched law enforcement to the scene rather than just EMS, and the EMS technicians could have provided testimony about whether they observed anything that indicated that Daniels might be under the influence. Because what the CI told Deputy Bell could not supply the reasonable suspicion needed to detain Daniels prior to

14

Deputy Bell's arrival, any available evidence that the State had or could have obtained relating to the initial encounter might have served to better bolster its case.

The absence of such evidence does not require a reversal here due to our determination that the location of the truck and the manner in which both Daniels and his truck were found created at least an ambiguous situation for which his continued detention was lawful. However, in cases such as this—involving a lapse of time and continued detention prior to a DUI investigation—the State would be wise to submit the strongest evidence possible to justify the detention. Otherwise the State risks having a conviction overturned.

_____

Opinion subject to revision prior to official publication.

15